**Erik WILLIAMS, Plaintiff,**

**v.**

**The CITY OF DALLAS, Benjamin Click, James Chandler, David Goelden, Ross Salverino, Kim Sanders, and certain Unnamed Members of the Dallas Police Department, individually and in their official capacities as police officers of the City of Dallas, Defendants.**

**No. CIV.A. 3:97–CV–0296D.**

United States District Court,
N.D. Texas,
Dallas Division.

March 5, 1998.

**6.** *Slaughter v. Levine,* 598 F.Supp. 1035, 1041 (D.Minn.1984)(rev'd on other grounds).

Jack Balagia, Jr., of McGinnis, Lochridge & Kilgore, L.L.P., Houston, TX, and Charles L. Babcock, E. Leon Carter, and James M. McCown, of Jackson Walker, L.L.P., Dallas, TX, for movants Charles L. Babcock and E. Leon Carter.

Peter R. Ginsberg and Linda B. Popejoy, of Foley, Hoag & Eliot, L.L.P., Washington, DC, Jack W. Pirozzolo and Colin Owyang, of Foley, Hoag & Eliot, L.L.P., Boston, MA, and Illona Sheffey–Rawlings, Dallas, TX, for plaintiff.

FITZWATER, District Judge.

The court is asked to decide motions to quash subpoenas *duces tecum* filed by two attorneys who represented parties in now-

concluded, related litigation initiated by the plaintiff in the present case. The principal question presented is whether the attorneys will be subjected to an undue burden, within the meaning of Fed.R.Civ.P. 45(c)(3)(A)(iv), if they are required to appear for deposition and produce the subpoenaed documents. Because the court concludes that the subpoenas, although facially overbroad, can be enforced as modified, it grants the motions in part and denies them in part.

## I

This is an action by plaintiff Erik Williams ("Williams"), a lineman for the Dallas Cowboys professional football team, against defendants the City of Dallas ("City"); Bennie R. Click ("Chief Click"),[1] the Chief of Police of the Dallas Police Department ("DPD"); James Chandler ("Sgt.Chandler"), an officer assigned to the DPD Public Information Office; David Goelden ("Lt.Goelden"), a Lieutenant in the DPD Crimes Against Persons ("CAPERS") Unit; Ross Salverino ("Sgt.Salverino"), a sergeant in the CAPERS Sexual Assault Unit; Kim Sanders ("Detective Sanders"), a DPD drug task force detective; and certain unnamed members of the DPD, individually and in their official capacities as police officers of the City of Dallas. Williams alleges that some or all the defendants are liable pursuant to 42 U.S.C. § 1983 for violating his rights under the Fourth and Fourteenth Amendments, and based on various pendent state-law claims, for conduct in which they engaged following an allegation by Nina Shahravan ("Shahravan") that Williams and an unnamed male had raped her in Williams' home while Dallas Cowboys teammate Michael Irvin ("Irvin") threatened her with a gun and videotaped the assault.[2]

## A

For purposes of deciding the present motion, the court recounts the background facts as Williams has pleaded them in his complaint.[3] Shahravan had for some period of time been a Dallas Cowboys "hanger-on" who had attended parties hosted by team players and had social contact with Irvin. Martin Griffin ("Griffin"), a reporter for the Dallas–Fort Worth NBC affiliate KXAS–TV, who was well-known for his tabloid-style of journalism and attacks on Cowboys players, capitalized on Shahravan's relationship with these athletes to use her as a source for stories critical of their off-field activities. In November 1996 Shahravan and Griffin approached Detective Sanders and other defendants with allegations of drug use and other activities by Cowboys players. Defendants declined to investigate because they doubted Shahravan's credibility. The same month, Shahravan devised a scheme to falsely implicate Irvin—who was already on probation for a prior drug conviction—in a drug transaction by acting as a courier who would supply him with drugs. She later decided not to go through with her plan. Despite this, Shahravan and Griffin contacted the DPD, including certain of the defendants, with a story that Shahravan has been used as a drug runner for Irvin. Defendants again determined that Shahravan was not credible, and declined to investigate.

Although Irvin was the principal target of Griffin's and Shahravan's activities, Williams eventually became involved after Irvin terminated social contact with Shahravan. On December 28, 1996 the Cowboys won an NFL playoff game. The next day, December 29, Williams attended a gathering of players and coaches. Shahravan contacted Williams, and the two agreed to meet at his house later that evening. Williams arrived with a male friend, and Shahravan consented to engage in sexual intercourse with both of them and to be videotaped while doing so.

---

1. Chief Click is sued as "Benjamin" Click. The court refers to him by his true name.

2. Irvin has filed a separate suit, *Irvin v. City of Dallas, Tex*., Civil Action No. 3:97–CV–1327–D, which is pending before the court.

3. Defendants deny the material allegations of Williams' complaint and deny that they are liable to him on any of the claims in this suit. As the

court explains *infra* at § II(C), however, for purposes of deciding whether subpoenas impose an undue burden on subpoenaed nonparties, the court measures relevance according to the standard prescribed by Rule 26(b)(1). The court therefore concludes that it should decide the motions to quash according to the allegations of Williams' complaint.

Irvin was not present and had not been to Williams' home in more than one year. No one threatened Shahravan with a gun and no gun was displayed to her. None of the three used drugs and no drugs were present in the house. Shahravan voluntarily engaged in sex with both men.

On December 30, 1996 Shahravan paged Williams and he returned her call. Shahravan asked him for tickets to the upcoming playoff game, but her true intent in calling him was to create a record that Williams had telephoned her the day after he "assaulted" her. Shahravan then spoke with Griffin about her story that Williams had raped her while Irvin had videotaped the assault and threatened her at gun point. Griffin and Shahravan then agreed to report the story to the DPD. Griffin either knew the allegations to be false, or acted negligently or in reckless disregard for the falsity of her claims.

Shahravan and Griffin approached the DPD with her charges. The afternoon of December 30 Shahravan and Griffin spoke with Detective Sanders. Despite the fact that Shahravan did not appear to be distraught, and the absence of corroborating signs of the violent sexual assault that Shahravan had described to him, Detective Sanders advised Shahravan to go immediately to Parkland Memorial Hospital ("Parkland"), the Dallas County public hospital, so that she could be examined for physical evidence of rape. Shahravan did not go to Parkland and Griffin did not take her there. Shahravan later told the defendants that she could not find the hospital, but her real reason for not going was her concern that there would be no physical evidence of rape.

That evening Shahravan returned to the DPD and met with Sgt. Salverino, a member of the DPD CAPERS Sexual Assault Unit, to whom she repeated her charges. She falsely informed Sgt. Salverino that Williams had violently assaulted her, slapped her, physically hurt her during sexual intercourse, and telephoned her to say that he would be more gentle the next time. Sgt. Salverino arranged for Shahravan to be examined at Parkland. The examination failed to corroborate the violent sexual assault that she had recounted. Although Shahravan had small bruises on her leg and back, the signs of the sexual encounter were consistent with consensual intercourse.

In response to Shahravan's charges, Sgt. Salverino executed an affidavit to obtain a search warrant. He described a violent sexual assault, mentioned that a videotape and gun might be found, and stated that a pool table might contain fingerprints. Sgt. Salverino did this despite the fact that defendants knew Shahravan not to be credible, that she had first reported her allegations to a tabloid-style television reporter known for attacking Dallas Cowboys football players, that the physical examination did not corroborate her description of a violent sexual attack, that she had offered the implausible explanation that she could not find Parkland, and that she did not appear to be distraught. In order to obtain a search warrant, Sgt. Salverino knowingly mischaracterized the Parkland examination results and omitted information that would have shed light on Shahravan's lack of credibility.

Based on the affidavit, on December 31, at 4:55 a.m., a state judge issued a search warrant for Williams' home. Chief Click, Sgt. Salverino, and other officers held a meeting after the affidavit was prepared and the warrant was issued. They decided to alert members of the media that a search was to be conducted of Williams' home. During the course of the search, they advised the local ABC affiliate.

At approximately 5:00 a.m. police officers arrived at Williams' home, knocked and announced their presence, and initiated a search. Officers cut eight pieces of felt from a pool table and seized a video camera, videotapes, three guns, hair samples, other personal items, and a videotape depicting Williams and Shahravan engaged in consensual sex.

Following the search, Chief Click convened a press conference and granted other exclusive press interviews. Defendants publicly announced that Williams and Irvin were suspects in an alleged rape, thereby violating a DPD policy that forbids disclosing the surnames of suspects in the narrative of any report of a sexual assault offense. Lt. Goel-

den stated in one interview that he believed a sexual assault had occurred at Williams' house and that charges would be filed against Williams. He also negligently or recklessly falsely stated that the arrests of Williams and Irvin were imminent, and that there was videotaped evidence of the assault.

Almost immediately following the press conference and interviews, defendants learned or should have learned that additional information belied Shahravan's allegations. The videotape depicted consensual sex and otherwise contradicted Shahravan's story in material respects. Defendants knew or should have known of evidence that Irvin was not present and that drugs were not used. Sgt. Chandler falsely and either negligently or recklessly advised the media that the DPD had no reason "to doubt [Shahravan's] credibility at this point." One defendant falsely advised the media that Irvin's voice could be heard on the videotape.

On January 10, 1997 the DPD announced that Williams and Irvin had been cleared and that Shahravan had recanted her story. Shahravan was charged and pleaded guilty to the misdemeanor offense of making a false report to a peace officer, a Class B misdemeanor under Texas law. DPD has refused to return the videotape to Williams, and DPD personnel have circulated it within the department, where it has been viewed as a form of entertainment in circumstances that could have no investigatory purpose.

## B

At about the time Williams brought the instant suit in this court, he also sued Griffin, Lin Television of Texas, Inc., and Lin Television of Texas, L.P. d/b/a KXAS Television (collectively "Lin") in Texas state court. Respondents Charles L. Babcock, Esq. ("Babcock") and E. Leon Carter, Esq. ("Carter") represented Griffin and Lin in the suit, which later settled and was dismissed in August 1997.

Several months later Williams served Babcock and Carter with notices of depositions and subpoenas *duces tecum* to produce three categories of documents:

1. Any and all documents relating to Erik Williams, Michael Irvin and Nina Shahravan;
2. All documents that Lin Television or KXAS–TV turned over to the Dallas County District Attorneys' office in connection with the criminal case against Nina Shahravan, except to the extent Lin Television or KXAS–TV has already produced said documents to Williams; and
3. All documents that were turned over to you by the Dallas County District Attorneys' office relating to the criminal case against Nina Shahravan in 1997.

Babcock and Carter responded by moving to quash the subpoenas and the notices of deposition. In identical arguments, they contend that the subpoenas should be quashed pursuant to Rule 45(c)(3)(A)(iii) because they require that Babcock and Carter disclose documents that are protected by the attorney-client privilege, the attorney work product doctrine, and the journalist's privilege. They also rely on Rule 45(c)(3)(A)(iv), contending that the document requests are so broad in scope that it would be unduly burdensome to comply with the subpoenas and deposition notices. Babcock and Carter posit that they should be treated as opposing counsel, and that Williams' attempt to obtain discovery from them should be narrowly confined to the circumstances in which such discovery may be conducted. They move to quash their respective depositions on the ground that the only relevant facts within their knowledge are protected as attorney work product or by the attorney-client privilege.

Of the three categories of documents requested, Babcock and Carter contend that Lin has already produced to Williams all documents that are responsive to category 2 and that there are no documents responsive to category 3. Br. at 5 n.1. Williams acknowledges that categories 2 and 3 are no longer at issue, and has limited his response to category 1. Opp. Br. at 2 n.1.

## II

### A

Babcock and Carter contend that the subpoenas are facially overbroad and burden-

some because Williams has not identified any specific document to be produced; the request is not limited in time or topic to any issue of consequence to this litigation or to any other litigation; the deposition notices fail to define the term "document," which could be interpreted to include any type of information that relates to Williams, Irvin, or Shahravan, regardless whether connected to the present suit; Babcock and Carter possess extensive materials that fall within the scope of the subpoenas, and complying with the request would impose tremendous expense on them to review each document for any applicable privilege or for relevance; and Lin has already provided many of these documents to Williams, and most of the other documents can be obtained from other sources, such as the parties to this lawsuit. In their reply brief, Babcock and Carter emphasize that they are entitled to greater protection because they were opposing counsel in Williams' state court suit against Griffin and Lin.

Williams responds that category 1, the sole category in dispute, is only intended "to cover documents relating to the allegations made by Shahravan which gave rise to this suit as well as to Williams' suit against KXAS and Griffin." Opp. Br. at 7. He refutes their assertion that it would be burdensome to require that they examine the documents in their possession, contending that they have failed to offer evidence that responding to the subpoenas would be unreasonable or oppressive. He posits that any burden is outweighed by his need for discovery because Babcock and Carter possess information that is critical to his claims, they may have evidence that one or more defendants improperly obtained, and "they may even have participated with the defendants in improper conduct in obtaining some of that information." *Id.*

## B

Rule 45(c)(3)(A)(iv) requires that on timely motion, the court by which a subpoena was issued must quash or modify the subpoena if it "subjects a person to undue burden." [4] The movant has the burden of proof, *Linder v. Department of Defense,* 133 F.3d 17, 24 (D.C.Cir.1998) (citing *Northrop Corp. v. McDonnell Douglas Corp.,* 751 F.2d 395, 403 (D.C.Cir.1984)); *Vitale v. McAtee,* 170 F.R.D. 404, 407 (E.D.Pa.1997), and must meet "the heavy burden of establishing that compliance with the subpoena would be 'unreasonable and oppressive.'" *Barnes Found. v. Township of Lower Merion,* 1997 WL 169442, at * 4 (E.D.Pa. Apr.7, 1997) (quoting *Composition Roofers Union Local 30 Welfare Trust Fund v. Graveley Roofing Enters., Inc.,* 160 F.R.D. 70, 72 (E.D.Pa.1995)).

"Whether a burdensome subpoena is reasonable 'must be determined according to the facts of the case,' such as the party's need for the documents and the nature and importance of the litigation." *Linder,* 133 F.3d at 24 (quoting *Northrop,* 751 F.2d at 407). Among the factors that the court may consider in determining whether there is an undue burden are "relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Concord Boat Corp. v. Brunswick Corp.,* 169 F.R.D. 44, 49 (S.D.N.Y.1996) (quoting *United States v. International Bus. Machs. Corp.,* 83 F.R.D. 97, 104 (S.D.N.Y. 1979)).[5] The status of a witness as a nonparty entitles the witness to consideration regarding expense and inconvenience. *Id.* (citing Rule 45(c)(2)(B)). Undue burden can be found when a subpoena is facially overbroad. *E.g., id.* at 51; *Semtek Int'l, Inc. v. Merkuriy Ltd.,* 1996 WL 238538, * at 2 (N.D.N.Y. May 1, 1996).

---

4. Rule 45(c)(3)(A)(iv):
   On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it ... subjects a person to undue burden.

5. *Concord Boat* derives this standard from a case decided prior to the 1991 amendments that included Rule 45(c)(3)(A)(iv). In view of *Linder,* 133 F.3d at 24, a 1998 decision that recognizes similar factors, and the *Concord Boat* court's decision in 1996 to apply its earlier test to Rule 45(c)(3)(A)(iv), the court concludes that these factors are applicable to a motion to quash made pursuant to this Rule.

## C

Category 1 of the instant subpoenas is overbroad on its face. It requires production of "[a]ny and all documents relating to Erik Williams, Michael Irvin and Nina Shahravan." It is limited neither by reasonable restrictions on time nor by particular documentary descriptions. *See Amcast Indus. Corp. v. Detrex Corp.*, 138 F.R.D. 115, 121 (N.D.Ind.1991) (holding that document request that was unlimited as to time frame, as well as to the types of writings sought, fell far short of fulfilling requirement of Rule 34(b) that each item or category of documents be described with reasonable particularity).[6] As Babcock and Carter point out, the category as phrased would require that they produce newspaper articles that mention Williams' and Irvin's performances in a football game. In this sense it is akin to an impermissible attempt to "obtain every document which could conceivably be relevant to the issues in this case." *Borden, Inc. v. Florida E. Coast Ry. Co.*, 772 F.2d 750, 756 (11th Cir.1985).

■ Modification of a subpoena is preferable, however, to quashing it. *Tiberi v. CIGNA Ins. Co.*, 40 F.3d 110, 112 (5th Cir.1994); *accord Linder v. National Sec. Agency*, 94 F.3d 693, 698 (D.C.Cir.1996) ("modification of a subpoena is generally preferred to outright quashing"). Williams contends that he only intends to request in category 1 that Babcock and Carter produce "documents relating to the allegations made by Shahravan which gave rise to this suit as well as to Williams' suit against KXAS and Griffin." [7]

■ The category, as modified, is considerably narrower and more focused in its temporal and substantive scope. Williams requests documents that relate to Shahravan's allegations that gave rise to Williams' present action and his related suit against Griffin and Lin. The allegations are explosive but circumscribed: Williams and an unnamed male raped her in Williams' home while Irvin threatened her with a gun and videotaped the assault. Her claims are narrow in time because they concern events that occurred on or about December 29, 1996, the date Shahravan asserted that Williams and the unnamed male assaulted her in Irvin's presence. They began no earlier than that date (when Shahravan contacted Williams to arrange their meeting) and ended no later than January 10, 1997 (when the DPD announced that Williams and Irvin had been cleared and that Shahravan had recanted her story).

Category 1, as modified, also seeks relevant materials. When a subpoena is issued as a discovery device, relevance for purposes of the undue burden test is measured according to the standard of Rule 26(b)(1). *See Linder*, 133 F.3d at 24 (citing Rule 26(b)(1) discovery standard in determining whether subpoena for relevant information imposed undue burden within meaning of Rule

---

**6.** The court does not suggest that subpoenas must always specify time or other limitations to avoid the undue burden restriction of Rule 45(c)(3)(A)(iv). For example, if a witness had limited involvement in the matters pertinent to the issues in the suit, merely identifying him by name and subpoenaing all documents that referred to him could be reasonable. The question of undue burden is fact specific. *Cf. Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 187 (1st Cir.1989) ("For the most part, there are no barbed-wire fences marking the precise boundaries of pretrial discovery. Management of discovery is a largely empirical exercise, requiring judges to balance the inquirer's right to know against the responder's right to be free from unwarranted intrusions, and then to factor in systemic concerns. Limits can best be set case by case.").

**7.** Williams points out that Babcock and Carter never sought clarification or discussion of the breadth of the request prior to moving to quash the subpoenas. Opp. Br. at 6–7. Babcock and Carter respond that it would be "absurd" to require that they confer with Williams' counsel to decipher the intended scope of the subpoena. Rep. Br. at 4. The court disagrees. Nearly ten years ago, in *Dondi Properties Corp. v. Commerce Sav. & Loan Ass'n*, 121 F.R.D. 284 (N.D.Tex. 1988) (en banc), this court adopted standards of litigation conduct to be observed in civil actions. Lawyers who are admitted to practice in this court, and those admitted *pro hac vice, see* N.D. Tex. Civ. R. 83.9(b), are obligated to read and comply with *Dondi*. It would have been consonant with the *Dondi* standards for Williams' counsel and Babcock and Carter's counsel to have conferred in an attempt to narrow the intended scope of the subpoena. *Cf. In re Exxon Valdez*, 142 F.R.D. 380, 381 (D.D.C.1992) (noting that opposing counsel attempted to negotiate scope and costs of production). In no event is such a proposition "absurd."

45(c)(3)(A)(iv)); *Concord Boat,* 169 F.R.D. at 48 (addressing Rule 45(c) protections in context of Rule 26(b)(1) scope of discovery, and stating that Rule 45(c) provides a level of protection that corresponds to Rule 26(c)). Rule 26(b)(1), of course, permits discovery of

> any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Williams alleges that the defendants are liable for violating his Fourth and Fourteenth Amendment rights, and on the basis of Texas law claims for defamation, intentional infliction of emotional distress, negligence, conversion, and trespass. There are several components of his case against the present defendants that appear to have a logical nexus to unprotected information that Babcock and Carter may possess: these include Griffin's complicity in Shahravan's false claims to the DPD; defendants' publication of false or private information to media sources, in violation of Williams' rights; Griffin's and Lin's possession of evidence seized from his home, particularly the videotape that depicts Williams and Shahravan engaged in consensual sexual activity, which Williams contends defendants improperly released; and evidence that corroborates Williams' assertions that the individual defendants conducted the investigation in a manner that was objectively unreasonable. Babcock and Carter may at least have custody of evidence that would lead to the discovery of admissible evidence.

### D

█ Babcock and Carter argue that Williams can obtain these materials from other sources, including the parties in this case. This assertion was at least partially correct when made in response to Williams' initially overbroad formulation of category 1. The category was so expansively framed that a host of sources were available. As modified, however, the category is not objectionable on this basis.

First, from Williams' standpoint, it is substantively critical to confirm that Griffin and Lin possessed materials that he contends the defendants in the present case should not have revealed at all or should not have disclosed when they did. The fact that defendants also have the evidence is irrelevant. What is probative is that Babcock and Carter have custody of materials that they obtained because defendants disclosed them—materials that Williams contends should have remained private or that were illegally obtained in the first instance.

Second, the individual defendants have asserted the affirmative defense of qualified immunity. A stay of discovery is currently in place, and any discovery that is permitted of the individual defendants will be limited in scope unless and until Williams defeats the defense. *See, e.g., Wicks v. Mississippi State Employment Servs.,* 41 F.3d 991, 994 (5th Cir.1995) (holding that "when the district court 'is unable to rule on the immunity defense without further clarification of the facts' and when the discovery order is 'narrowly tailored to uncover only those facts needed to rule on the immunity claim,' an order allowing such limited discovery is neither avoidable nor overly broad" (footnote omitted)) (quoting *Lion Boulos v. Wilson,* 834 F.2d 504, 507–08 (5th Cir.1987)). Under these circumstances, Williams' need to obtain evidence from a nonparty is heightened by the unavailability of discovery from a party. *Cf. Concord Boat,* 169 F.R.D. at 49 (stating that "need of the party for the documents" is fact that court can consider in determining undue burden).

Third, several of Williams' allegations are based on his contention that the defendants knew or should have known that Shahravan was lying, and that they should have questioned the reliability of Shahravan's and Griffin's representations. There may be unprotected documents in the care of Babcock and

Carter that the defendants do not possess, but that substantiate his claims.

### E

■ Babcock and Carter advance the related arguments that as nonparties, and as counsel for parties whom Williams sued in the related state court case, they are entitled to greater protection against undue burden and harassment.

The court may quickly dispense with the adverse counsel harassment argument. The opposing counsel cases that Babcock and Carter cite in their reply brief each involve an attempt to depose counsel for an opposing party to the case in which the discovery was requested. Rep. Br. at 2.[8] Moreover, although Babcock and Carter were opposing counsel in Williams' suit against Griffin and Lin, they have not established that Williams' attempt to obtain documents from them is driven by a harassing animus. Williams did not, for example, lose the case against Griffin and Lin and then vindictively subpoena opposing counsel. The parties settled. And as the court has already explained, Williams has demonstrated that he seeks relevant evidence that, viewed through the substantive prism of his claims in the present case, he reasonably is pursuing from counsel for Griffin and Lin.

Babcock and Carter correctly point out that the fact that they are nonparties is an important factor that the court may consider in deciding whether to quash the subpoenas. *Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed.Cir.1993) (collecting cases); *United States v. Columbia Broadcasting Sys., Inc.*, 666 F.2d 364, 371–72 (9th Cir.1982). Nevertheless, for the reasons already explained in this opinion, the court holds that Babcock's and Carter's status as nonparties, either by itself or in combination with other factors, does not support a finding of undue burden.

### F

The court turns next to the contention that the subpoenas are unduly burdensome because they will require that Babcock and Carter review potentially thousands of documents and incur approximately $9,000 in attorney's fees in doing so. This argument does not justify quashing the subpoenas because the court is authorized to award Babcock and Carter any relief that is necessary to obviate their incurring significant expenses.

The court must address initially its authority to award such relief. Rule 45 was amended in 1991. The amended Rule contains certain monetary protections for subpoenaed parties. *See* Rule 45(c)(1) (providing for imposition of appropriate sanction if subpoenaing party or attorney breaches duty to take reasonable steps to avoid imposing undue burden or expense on subpoenaed person); Rule 45(c)(2)(B) (directing that court order compelling production shall protect nonparty or person who is not an officer of a party from significant expense resulting from inspection and copying commanded); and Rule 45(c)(3)(B)(iii) (providing that if nonparty or person who is not an officer of a party must incur substantial expense to travel more than 100 miles to attend trial, court may order compliance with subpoena when *inter alia* subpoenaed person will be reasonably compensated). None of these remedies is available in the present case.

One commentator has suggested that Rule 45(c)(1) is so narrow in scope that "only a step taken under a given provision that is so far beside the mark as to be patently *unreasonable* should invoke a sanction." David D. Siegel, *Practice Commentary C45–20, 28*

---

8. *See Shelton v. American Motors Corp.*, 805 F.2d 1323, 1325, 1326–27 (8th Cir.1986) (addressing deposition of in-house litigation department supervising attorney assigned to case, and criticizing "increasing practice of taking opposing counsel's deposition" in context of opposing trial counsel in case in which deposition was noticed); *Harriston v. Chicago Tribune Co.*, 134 F.R.D. 232, 233 (N.D.Ill.1990); *Advance Sys., Inc. of Green Bay v. APV Baker PMC, Inc.*, 124 F.R.D. 200,

200–01 (E.D.Wis.1989). Babcock and Carter also cite this court's December 11, 1997 order, in which it denied defendants' request to take the deposition of Williams' counsel. *See Williams v. City of Dallas*, Civil Action No. 3:97–CV–0296–D, Order at 1–2 (N.D.Tex. Dec. 11, 1997) (Fitzwater, J.). This order is also distinguishable, however, because it relates to an attempt to depose opposing counsel in the case in which the deposition was sought.

U.S.C.A., Fed.R.Civ.P. 45, at 385 (emphasis in original). Williams' conduct is not sanctionable under this standard. The relief provided by Rule 45(c)(2)(B) applies when a motion to compel is filed in response to an objection to a subpoena. *See In re Exxon Valdez,* 142 F.R.D. 380, 381 (D.D.C.1992) (interpreting Rule in the context of motion to compel); *cf. Standard Chlorine of Del., Inc. v. Sinibaldi,* 821 F.Supp. 232, 262–63 & 263 n. 31 (D.Del.1992) (recognizing that Rule 45(c)(2)(B) would apply if subpoenaed party had filed motion to compel, but applying Rule to subpoenaed party's motion for protective order). Williams has not filed a motion to compel. Rule 45(c)(3)(B)(iii) is limited on its face to trial (not discovery) subpoenas. *But see In re Letters Rogatory,* 144 F.R.D. 272, 278–79 (E.D.Pa.1992) (citing Rule 45(c)(3)(B)(iii) as support for award of reasonable costs of production for nonparty who moved to quash or modify subpoena, issued pursuant to Letters Rogatory, for production of documents and material). Williams' subpoenas *duces tecum* are not trial subpoenas.

■ Nevertheless, prior to the 1991 amendment to Rule 45, courts recognized their discretion to condition enforcement of subpoenas on nonparties on the serving party's paying the costs of production. *Standard Chlorine,* 821 F.Supp. at 263 (citing *Exxon Valdez,* 142 F.R.D. at 383). Because the relevant changes adopted in 1991 converted the court's pre-amendment discretionary authority to a mandatory obligation, *see Exxon Valdez,* 142 F.R.D. at 383, the court holds that the absence of a mandate to protect subpoenaed parties does not deprive it of the discretion to do so. *Cf. Standard Chlorine,* 821 F.Supp. at 262–65 (addressing pre- and post–1991 amendment jurisprudence, implicitly declining to treat them as mutually exclusive, and awarding conditional relief to subpoenaed party on both bases).

■ Courts that have imposed discretionary relief prior to the amendment to Rule 45 generally have considered such non-exclusive factors as the scope of the discovery, the depth of the invasion involved in the request, the extent to which the producing party must separate responsive information from privileged or even irrelevant material, and the reasonableness of the expenses involved in making the production. *Id.* at 263 (citing cases); *see Exxon Valdez,* 142 F.R.D. at 383 (addressing factors). Having considered these factors, the court holds that Babcock and Carter should be awarded their reasonable costs and expenses of complying with the subpoenas.

The anticipated expenses are not of sufficient magnitude to justify prepayment, but they are still potentially substantial. *Cf. Standard Chlorine,* 821 F.Supp. at 265 (tentatively awarding $1,750.00 in anticipated document production expenses). Babcock has adduced affidavit evidence that responding to the subpoenas, with the use of paralegals and younger attorneys where appropriate, will potentially involve reviewing 30 boxes of documents and other items that relate to Williams' suit against Griffin and Lin. These boxes contain approximately 210 individual files, 52 audio and video tapes and accompanying transcripts, 23 trial and research notebooks, several hundred newspaper articles and investigative documents, and approximately 1,000 documents produced in response to nine depositions. Babcock Aff. at ¶¶ 4–5. These expenses presumably must be absorbed by Lin, which likely did not consider the potential for such expenses when it calculated the amount for which it was willing to settle Williams' suit against it. In view of the privilege issues that are likely to arise because the parties were involved in prior litigation, Babcock and Carter will perforce be required to give careful scrutiny to the materials in their custody. And since Williams seeks to obtain materials directly from counsel for Griffin and Lin rather than from the parties themselves, there will likely be a considerable amount of attorney work product that falls within the literal scope of the modified subpoenas.

The court declines to direct that Williams advance to Babcock and Carter their expected costs. The sum of $9,000 in attorney's fees that Babcock and Carter estimate they will incur is based on projected work in responding to the unmodified version of category 1, and will perhaps be significantly lower. The court is unable to calculate this

uncertain cost with sufficient precision to make an advance award. *See* Fed.R.Civ.P. 45(c)(2)(B) advisory committee's note ("The court is not required to fix the costs in advance of production, although this will often be the most satisfactory accommodation to protect the party seeking discovery from excessive costs. In some instances, it may be preferable to leave uncertain costs to be determined after the materials have been produced, provided that the risk of uncertainty is fully disclosed to the discovering party.").

After Babcock and Carter comply with the subpoenas, they may move for appropriate relief in the event the parties cannot resolve the issue amicably.

### G

■ The court now turns to Babcock and Carter's contention that the subpoenas should be quashed because they do not define the term "document," and could therefore be interpreted to include any type of information that relates to Williams, Irvin, and Shahravan, regardless whether pertinent to the present suit. This assertion appears to mix two concepts: the meaning of the term "document," and the scope of the documents that are responsive to the subpoenas, as phrased.[9]

Although the term "document" is undefined in the subpoenas, it certainly has meaning when used in Rule 45 (which concerns subpoenas) and Rule 34 (which governs production of documents), both of which are germane here. Rule 45(c)(2)(A)[10] does not define the term "document," although it does suggest that documents are not necessarily the same as books, papers, or intangible things (otherwise, why use four terms disjunctively?). Rule 34(a)[11] likewise does not define the term, but it contemplates that documents include writings, drawings, graphs, charts, photographs, phonorecords, and other data compilations. Rules 45 and 34 can be read together to convey a comprehensible understanding of the types of materials that must be produced when a subpoena refers to the term "documents" without defining it. The subpoenas in the present case are not defective for failing to supply a definition.[12]

Babcock and Carter's assertion that the scope of the request is overbroad has now been addressed by the court's decision that the modified subpoena does not subject them to an undue burden.

### III

The next question presented is whether the subpoenas and deposition notices should

---

**9.** The argument also appears to be somewhat disingenuous. When Babcock filed his affidavit quantifying the undue burden that would be imposed in responding to the subpoenas, he several times used the term "documents" in a manner that reflects a clear understanding of the term in everyday use in the legal profession. *See, e.g.,* Babcock Aff. at ¶ 4.

**10.** Rule 45(c)(2)(A):

A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

**11.** Rule 34(a):

Any party may serve on any other party a request (1) to produce and permit the party making the request, or someone acting on the requestor's behalf, to inspect and copy, any designated documents (including writings, drawings, graphs, charts, photographs, phono-records, and other data compilations from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonably usable form), or to inspect and copy, test, or sample any tangible things which constitute or contain matters within the scope of Rule 26(b) and which are in the possession, custody or control of the party upon whom the request is served; or (2) to permit entry upon designated land or other property in the possession or control of the party upon whom the request is served for the purpose of inspection and measuring, surveying, photographing, testing, or sampling the property or any designated object or operation thereon, within the scope of Rule 26(b).

**12.** In fact, in those courts where Rule 26(a)(1)(B) applies, it requires that parties produce all "documents" in the possession, custody, or control of the party that are relevant to disputed facts alleged with particularity in the pleadings. Were the term "documents" difficult to comprehend without a definition, the Rule would have little value as a self-executing directive.

be quashed pursuant to Rule 45(c)(3)(A)(iii) because they require production of documents that are protected by the attorney-client privilege, by the work product doctrine under Rule 26(b)(3), and by the Texas journalist's privilege. Although Williams advances several responsive arguments, some of which address the merits of these assertions, the court need only reach his contention that Babcock and Carter have failed to comply with Rule 45(d)(2), which provides:

> When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

This provision is necessary "to provide a party whose discovery is constrained by a claim of privilege or work product protection with information sufficient to evaluate such a claim and to resist if it seems unjustified." Fed.R.Civ.P. 45(d)(2) advisory committee's note. To reject Babcock and Carter's argument that the subpoenas should be quashed because they seek production of protected matters, it is sufficient to point to their obligation under Rule 45(d)(2) to lodge objections on the basis of the attorney-client privilege, the work product doctrine, and the journalist's privilege that are "supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim."[13] When those objections have been made, the court can then decide whether quashal is warranted under Rule 45(a)(3)(A)(iii).

■ Williams maintains that Babcock's and Carter's failure to comply with Rule 45(d)(2) results in waiver of these protections. The court disagrees in the context of the present case. Williams served subpoenas that were facially overbroad. Babcock and Carter had no obligation to undertake the task of lodging objections to a potentially

vast array of protected materials that technically fell within the scope of the subpoenas. *See Concord Boat,* 169 F.R.D. at 48, 51–52 (holding that fact that subpoena was facially overbroad and exceeded bounds of fair discovery presented unusual circumstance and good cause that excused failure to object); *Semtek,* 1996 WL 238538, at *2 (same). To adopt Williams' view would be to deprive a subpoenaed party of its right to quashal or modification by requiring that it comply with Rule 45(d)(2) notwithstanding the protection afforded by Rule 45(a)(3)(A).

Until the Rule 45(d)(2) procedure is followed, the court declines to reach the merits of Williams' reliance on the crime-fraud exception and the proper scope of the attorney-client privilege, the work product doctrine, and the journalist's privilege, because the court is uncertain what protection will be claimed and with respect to what documents. The court will not engage in hypothetical decisionmaking about documents that may need to be reviewed *in camera. Cf. RTC v. Bright,* 157 F.R.D. 397, 401 (N.D.Tex.1994) (Fitzwater, J.) (conducting *in camera* inspection before determining whether documents were privileged).

## IV

■ Babcock and Carter contend their depositions should be quashed because any facts that they obtained were derived as part of their representation of Lin, and all information that they possess is privileged or attorney work product. The court disagrees.

In order to deprive Williams of his "venerable 'right to every man's evidence,' " *Smith v. Smith,* 154 F.R.D. 661, 670 (N.D.Tex.1994) (Fitzwater, J.), Babcock and Carter must do more than advance a blanket assertion of attorney-client privilege and attorney work product. *See Varo, Inc. v. Litton Sys., Inc.,* 129 F.R.D. 139, 142 (N.D.Tex.1989) (Fitzwater, J.); *Hugley v. Art Institute of Chicago,* 981 F.Supp. 1123, 1128 (N.D.Ill.1997) ("Further, a party cannot simply make a blanket

---

**13.** Babcock and Carter did include in their contemporaneous objections to the subpoenas *duces tecum* the assertion that category 1 required the production of materials that are protected by the attorney-client or journalist's privilege, or are attorney work product. They did not include in their objections the supporting descriptions required by Rule 45(d)(2).

claim of privilege; rather, the party must claim and establish the attorney-client privilege on a document-by-document basis."). Largely for the reasons that the court has already discussed, they are not entitled to have their depositions quashed *in toto.* The court holds that they can be required to give their depositions, and it denies their motions to quash to the extent they seek to preclude the depositions outright.

\*    \*    \*    \*    \*    \*

Except to the extent that the court concludes that the subpoenas should be complied with as modified, the court grants the motions to quash. The stay imposed by the court in its November 25, 1997 order is hereby vacated.

SO ORDERED.