David LINDER, et al., Plaintiffs,

v.

Adolfo CALERO–PORTOCARRERO,
et al., Defendants.

Misc. Nos. 94–147 SSH, 94–150 SSH.

United States District Court,
District of Columbia.

Oct. 23, 1998.

**316**

Ursala Werner, Powell, Goldstein, Frazer & Murphy, for Plaintiffs.

W. Mark Nebeker, U.S. Attorney's Office for the District of Columbia, Department of State, Washington, DC, for Defendants.

### *OPINION*

STANLEY S. HARRIS, District Judge.

This matter is before the Court on plaintiffs' motion for an expanded search, for denial of claims of privilege by the Department of Defense ("DoD") and the Department of State ("DoS") as to documents identified in any previous search, and for production of documents identified in any previous search by the DoD and the DoS; the DoD's response; the DoS's response; and plaintiffs' replies. Upon consideration of the entire record, the Court denies plaintiffs' motion in part and grants it in part as modified.

### BACKGROUND

The movants in these cases are plaintiffs in a civil suit in the Southern District of Florida, *Linder v. Calero–Portocarrero*, No. 88–702, which seeks damages for the death of Benjamin Linder. Linder was a United States citizen working as an engineer on an electricity development project in El Cua, Nicaragua. On April 28, 1987, Linder was killed at San José de Bocay, Nicaragua, allegedly by members of a Nicaraguan Democratic Force ("FDN") patrol. His death was allegedly part of a campaign by counterrevolutionary organizations to terrorize the Nicaraguan population by attacking, torturing, and executing development, technical, and medical workers. Plaintiffs allege that defendants played prominent roles in the formation and operation of these counterrevolutionary organizations, namely the FDN, the United Nicaraguan Opposition ("UNO"), and the Nicaraguan Resistance ("RN") (collectively the "contra organizations").

On September 30 and October 5, 1993, plaintiffs served subpoenas on the DoD and the DoS, respectively, requesting fifteen categories of documents.[1] Plaintiffs requested all documents generated between January 1, 1984, and January 1, 1989, concerning the FDN, UNO, and RN; the four defendants, Adolfo Calero–Portocarrero, Enrique Bermúdez–Varela, Aristides Sánchez–Herdocia, and Indalecio Rodríguez–Alaniz; Benjamin Linder; the April 28 El Cua attack and all persons involved in the attack; and the formation, operation, and command of the Franciso Rodriguez Task Force, the Juan Castro Regional Command, and the Rafael Herrera Operational Command. In addition, the subpoenas requested all documents discussing similar attacks in the region of northern Jinotega, Nicaragua, as well as information regarding all "human rights" abuses committed or alleged to have been committed by the FDN, UNO, and RN, without time limitations.

The agencies challenged the subpoenas based on undue burden and privilege, and so on May 2, 1994, plaintiffs moved for an order compelling compliance with the subpoenas. On August 2, 1994, the Court denied plaintiffs' motion to compel, ordering the parties to submit suggestions for a modified subpoena and sample searches of the relevant information. The parties were unable to agree on the proper scope of a modified subpoena,[2] and the Court issued a modified subpoena based on the government's version which covered the following categories of information:

---

1. Plaintiffs also served subpoenas on the Central Intelligence Agency ("CIA") and the Federal Bureau of Investigation ("FBI"). *See Linder v. Calero–Portocarrero*, Misc. No. 94–146 SSH (CIA); *Linder v. Calero–Portocarrero*, Misc. No. 94–149 SSH (FBI). None of the agencies are parties to the Florida case.

2. Plaintiffs' modified version was almost identical to plaintiffs' current request for an expanded search. *Compare* Pls.' Revised Subpoena and Proposed Search and Briefing Schedules of Oct. 14, 1994, at Attachment A, *with* Pls.' Mot. for Expanded Search of Apr. 30, 1998, at 1–2.

(1) all information generated between January 1, 1984, and December 31, 1988, concerning Benjamin Linder;

(2) all information generated between January 1, 1987[,] and December 31, 1988, on the March 28, 1987, attack on the El Cua hydroelectric plant and the April 28, 1987, attack on San José de Bocay in which Benjamin Linder was killed;

(3) all information generated between April 1, 1986, and April 30, 1988, concerning contra attacks at the following locations in Nicaragua: El Cua, San José de Bocay, Northern Jinotega, and Quebrada Grande;

(4) all information generated between October 1, 1986, and October 31, 1987, on Adolfo Calero–Portocarrero, Enrique Bermúdez–Varela, Aristides Sánchez–Herdocia, and Indalecio Rodríguez–Alaniz.

*See* Mem. Or. of Dec. 12, 1994, at 3.

On August 21, 1995, plaintiffs submitted a "Motion for Further Relief" requesting that the Court order the DoD and the DoS:

(1) to supply plaintiffs with a list and description of documents withheld pursuant to claims of privilege and a declaration detailing the grounds for invoking the various statutory or other privileges; (2) to furnish to the Court for *in camera* review those documents withheld pursuant to claims of privilege and/or lack of relevance; and (3) to conduct a further search for documents concerning the policy and practice of defendants' forces toward civilians, wounded, prisoners of war and foreigners working in Nicaragua.

Mot. for Furth. Relief of Aug. 21, 1995, at 1. The Court denied plaintiffs' motion on December 6, 1996, holding (1) that the requested search would impose an undue burden on the agencies which outweighed the relevance of the information, and (2) that the documentation already submitted by the agencies in support of their claims of privilege was sufficient, so further declarations and *in camera* review were unnecessary.

David Linder, the father of Benjamin Linder, appealed the Court's December 6, 1996, Order. The Court of Appeals, however, held that the December 1996 order was not a final order with respect to the DoD or the DoS because "[t]he district court ... denied the Linders only the specific relief they sought— *Vaughn* indices and *in camera* review.... [and] neither resolved the privilege claims nor determined whether the withheld documents should be produced." *Linder v. Department of Defense,* 133 F.3d 17, 22 (D.C.Cir.1998). Accordingly, Linder's appeal was dismissed in these two cases, restoring jurisdiction in this Court.[3]

## ANALYSIS

Plaintiffs' motion for an expanded search requests the following information:

1. All documents concerning Benjamin Linder;

2. All documents concerning the March 24, 1987, attack on the El Cua hydroelectric plant where Mr. Linder worked and the April 28, 1987, attack on San José de Bocay in which he was killed;

3. All documents concerning contra activities in El Cua, San José de Bocay and the Jinotega region between April 1, 1986, and April 30, 1988;

4. All documents concerning the four named defendants, Adolfo Calero–Portocarrero, Enrique Bermúdez–Varela, Aristides Sánchez–Herdocia, and Indalecio Rodríguez–Alaniz, between April 1, 1986, and April 30, 1988;

5. All documents concerning the following twelve named individuals:

Augustus Rivera Zamora, alias Mapuchin

---

**3.** Linder also appealed the Court's denial of the motion for further relief in the related cases involving subpoenas served on the CIA and the FBI. After concluding that it had jurisdiction over the appeals in those two cases, the Court of Appeals reversed this Court's Order denying the Linders' request to expand the scope of the CIA and FBI subpoenas because (1) the Court of Appeals somehow believed that this Court did not consider the relevance of the requested documents to all the theories of plaintiffs' case, and (2) this Court did not have man-hour estimates for the CIA. *Linder,* 133 F.3d at 23–25. On remand, plaintiffs filed identical motions for an expanded search in the CIA and FBI cases, which the Court has already resolved. *See Linder v. Calero–Portocarrero,* 180 F.R.D. 168 (D.D.C.1998) [hereinafter *"Linder II "*].

Vincente Hernandez Garcia, alias Agustin

Santiago Giron Meza, alias William

Pedro Lopez Torres, alias Alberto

Ramon Herrera Palma, alias Estrella

Julio Antonio Garmendia Cordero, alias Negro

Alejandro Gonzales Medina, alias Alcides

Alejandro Flores Gonzales, alias Erasmo

Encarnacion Baldiva Chavarria, alias Tigrillo

Rufo Cesar Zeledon Castilblanco, alias Rolando

Jose Danilo Galeano Rodas, alias Tiro Al Blanco

Jose Santos Aguilera Sanchez, alias Gavilan;

6. All documents concerning the following contra units between October 1, 1986, and October 30, 1987:

Franciso Rodriguez Task Force

Juan Castro Regional Command

Rafaela Herrera Operational Command;

7. All documents concerning the human rights policies and practices of the following contra organizations:

Nicaraguan Democratic Force (FDN)

Unified Nicaraguan Opposition (UNO)

Nicaraguan Resistance (RN); and

8. All documents concerning the command structure of the following contra organizations between April 1, 1986, and April 30, 1988:

Nicaraguan Democratic Force (FDN)

Unified Nicaraguan Opposition (UNO)

Nicaraguan Resistance (RN).

Pls.' Mot. for Expanded Search of Apr. 30, 1998, at 1–2. It also asks the to Court deny any claims of privilege asserted by the DoD and the DoS as to documents identified in any previous search.

---

4. In addition to alleging that the four individual defendants were directly responsible for Benjamin Linder's death, plaintiffs claim that:

(b) The torture and murder of Benjamin Linder was carried out in compliance with and pursuant to FDN policy and practices of widespread torture, summary execution and inhu-

Both the DoD and the DoS object to this new search on the ground that it would impose an undue burden on the agencies. They propose a modified search that they assert will capture most of the documents relevant to plaintiffs' case, and request that plaintiffs be required to pay half the cost of any further searches. The DoS also submits the declaration of the Secretary of State, Madeleine K. Albright (hereinafter "Albright Decl.") to support its claims of privilege. The DoD indicates that it has released to plaintiffs all relevant portions of the previously disputed documents.

### I. *Motion for an Expanded Search*

■■■ A party generally "may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action .... [or which] appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R.Civ.P. 26(b)(1). A subpoena for relevant information may be modified or quashed entirely if the request for information is unreasonable or oppressive. *See* Fed.R.Civ.P. 45(c)(3)(A)(iv); *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 403 (D.C.Cir. 1984). The burden of proving that a search for information would be unduly burdensome is on the party moving to quash. *Northrop*, 751 F.2d at 403; *Westinghouse Electric Corp. v. City of Burlington*, 351 F.2d 762, 766 (D.C.Cir.1965).

### A. Plaintiffs' Requested Expanded Search Is Unduly Burdensome, and Therefore Will Not Be Enforced as Written

The documents sought in plaintiffs' most recent request for documents are relevant, within the meaning of Federal Rule of Civil Procedure 26(b)(1), to the three theories of liability which plaintiffs are pursuing in their case in Florida.[4] Defendants complain, how-

---

man and degrading treatment directed against civilians, prisoners of war, and those placed *hors de combat*, ordered, approved, authorized, directed, and ratified by [defendants]. Defendants, as direct commanders of the FDN, are responsible for the murder and torture of Benjamin Linder by individuals under their com-

ever, that the requested expanded search is unduly burdensome because it is overly broad and compliance would require the expenditure of too many resources.

■ A request for relevant information may be denied if the request is unreasonable or oppressive. *See* Fed.R.Civ.P. 45(c)(3)(A)(iv); *Northrop*, 751 F.2d at 403. The burden of proving that a search for information would be unduly burdensome is on the party requesting relief from the subpoena. *Linder*, 133 F.3d at 23; *Northrop*, 751 F.2d at 403. "Whether a burdensome subpoena is reasonable 'must be determined according to the facts of the case,' such as the party's need for the documents and the nature and importance of the litigation." *Linder*, 133 F.3d at 24 (quoting *Northrop*, 751 F.2d at 407). Moreover, Rule 45(c) (delineating the circumstances justifying quashing a subpoena) was "not intended to diminish rights conferred by Rules 26–37." *See* Fed.R.Civ.P. 45 Adv. Comm. note to 1991 Amendment; *see also Heat & Control, Inc. v. Hester Indus., Inc.*, 785 F.2d 1017, 1023 (Fed.Cir.1986) (noting that Rule 45 must be read in light of Rule 26(b)); 9A Wright & Miller, Federal Practice and Procedure: Civil 2d § 2452 (1995). Accordingly, factors to be considered in the undue burden analysis

include relevance, the need of the party for the documents, whether the request is cumulative and duplicative, the time and expense required to comply with the subpoena (relative to the responder's resources), and the importance of the issues at stake in the litigation.[5] *See* Fed.R.Civ.P. 26(b)(2); *Williams v. City of Dallas*, 178 F.R.D. 103, 109 (N.D.Tex.1998) (listing factors); *United States v. International Business Machines Corp.*, 83 F.R.D. 97, 104 (S.D.N.Y.1979) (listing factors and citing cases).

■ The Court concludes that plaintiffs' request for an expanded search is unduly burdensome, considering all the relevant factors. Plaintiffs' litigation addresses a significant issue concerning the safety of American workers employed abroad in a wartime setting. The requested search also might well result in the retrieval of some relevant documents. In the process, however, a search as broad as that proposed by plaintiffs would also generate mountains of irrelevant documents.[6] Moreover, plaintiffs' need for such a sweeping search was reduced by the agencies' search in compliance with the modified subpoena of 1994. Assuming such information exists, that search should have supplied plaintiffs both with evidence directly linking

---

mand, who were acting pursuant to policies and practices established, approved, or ratified by defendants.

 (c) Alternatively, defendants Calero, Rodriguez and Sanchez had knowledge that the FDN executed wounded and defenseless persons, persons placed *hors de combat*, and tortured the wounded. Despite this knowledge and their power as the leaders and commanders of a centrally directed and hierarchically structured military organization to stop these practices, they failed to take steps to stop such practices. Their failure to do so constituted knowing participation in a conspiracy to murder and torture Linder.

*Linder v. Calero*, No. 88–702 (S.D.Fla.) (Plaintiffs' Third Amended Complaint ¶ 40(b) & (c)).

**5.** The Court notes that plaintiffs devoted seven pages of their replies to a discussion of the scope of the Court of Appeals' remand in *Linder v. Department of Defense*, 133 F.3d 17 (D.C.Cir. 1998). In light of plaintiffs' apparent concern with this issue, the Court notes that because the Court of Appeals dismissed the appeals in these cases for lack of jurisdiction, there is no "scope of remand" limiting the Court's consideration of the requested expanded search.

**6.** This is particularly true with respect to categories 5 and 7. *See, e.g.,* Declaration of Margaret P. Grafeld ¶ 4 (noting that "several of plaintiff's [sic] requested expanded search areas (paragraphs nos. 5, 7, and 8 in particular) were overly broad and tended to produce large numbers of arguably potential items"). Category 5 requests all documents mentioning twelve individuals (who allegedly participated in the attack on Benjamin Linder), without any attempt to limit the search by linking the names to Linder's death or the time period surrounding it. Category 7 suffers from similar deficiencies. Although documents about certain contra policies during the time period at issue in this case are relevant, the so-called human rights policies of the contra organizations years before or after the death of Benjamin Linder are not. *See IBM*, 83 F.R.D. at 107 ("A demand for documents should cover a reasonable time period to insure that the materials desired are sufficiently identified and to confine the search to relevant documents."). Moreover, the use of the undefined term "human rights policies" would result in the production of documents discussing "human rights policies" with no relevance whatsoever to the Linder case.

defendants with Linder's death and indirect evidence of the relevant policies and practices of the contra organizations.

The agencies have "describ[ed] the precise nature of [their] burden[s]" in a number of ways. *Linder*, 133 F.3d at 24. "Undue burden can be found when a subpoena is facially overbroad." *Williams*, 178 F.R.D. at 109; *see also IBM*, 83 F.R.D. at 106–107. The first four categories of plaintiffs' requested expanded search are almost exactly the same as the search which the agencies have already performed, except that the new search lacks any time restrictions.[7] Any documents directly linking defendants to Linder's death which would be discovered by performing a search encompassing categories 5 and 6 should also be discovered by a search of categories 1–3. Moreover, any indirect information about the policies of the contras which could conceivably be discovered by searches encompassing categories 2–6 should also be discovered by a single search similar to category 7. Thus, enforcing plaintiffs' requested enlarged search would result largely in the production of information which is "unreasonably cumulative or duplicative" of information plaintiffs already have. *See* Fed. R.Civ.P. 26(b)(2).

The time and expense required for the agencies to respond to the requested expanded search, even taking into account the resources of the federal government, *see IBM*, 83 F.R.D. at 108, also support the Court's conclusion that the requested search is unduly burdensome. Whether compliance with a requested search would be unduly burdensome depends on the volume of material requested, the ease of searching for the requested documents in the form presented, *see Northrop*, 751 F.2d at 404, and whether compliance threatens the normal operations of the responding agencies. *See IBM*, 83 F.R.D. at 108.

The affidavits submitted by both agencies over the course of this litigation make it clear that responding to plaintiffs' expanded search, as written, would take an inordinate amount of time and resources. The DoD estimated that compliance with plaintiffs' first subpoena would require thousands of man-hours.[8] *See* Decl. of Charles Randolph Ball ¶¶ 5–6 (June 13, 1994) (estimating that it would take the Army approximately 1,300 man-hours to complete a search in response to plaintiffs' first subpoena); Decl. of Robert F. Stamps ¶¶ 4–5 (June 28, 1994) (estimating that it would take the Air Force "thousands of man-hours" and cost slightly less than $900,000, to comply with plaintiffs' first subpoena); Decl. of James A. Braga ¶ 6 (June 7, 1994) (estimating that it would take the Defense Intelligence Agency approximately 620 man-hours over 63 days to respond to plaintiffs' first subpoena). The DoS demonstrates the oppressiveness of plaintiffs' requested search through the declaration of Margaret P. Grafeld, the DoS's Information and Privacy Coordinator and the Director of the Department's Office of Information Resources Management Programs and Services. After describing the various DoS filing systems, she states that "the length of time for actual processing of plaintiff's [sic] expanded search request ... [including] receipt, search, review, and administrative out-processing [ ], would require an estimated 8000 person hours to complete, at a possible administrative cost in excess of $300,000." Decl. of Margaret P. Grafeld ¶ 18 (June 24, 1998). She goes on to describe the heavy workload which the DoS is already facing in response to other cases, investigations, and Freedom of Information Act requests. *Id.* at ¶¶ 19–21. Based on these submissions, the Court con-

---

7. For example, the agencies previously searched for "all information generated between January 1, 1987[,] and December 31, 1988, on the March 28, 1987, attack on the El Cua hydroelectric plant and the April 28, 1987, attack on San José de Bocay in which Benjamin Linder was killed." *See* Mem. Or. of Dec. 12, 1994, at 3. Plaintiffs now request that the agencies perform exactly the same search without a time limit. *See* Pls.' Mot. for Expanded Search of Apr. 30, 1998, at 1–2.

8. This estimation is relevant because plaintiffs' first subpoena is substantially similar to their expanded search request. The first subpoena was broader in that it requested all documents concerning the finances and the military training camps of the FDN, the UNO, and the RN. This additional information is offset by the fact that plaintiffs' expanded search requests several categories of documents without reference to time; the original subpoena limited most categories of information to a five-year period from January 1, 1984, until January 1, 1989.

cludes that both agencies have overcome the presumption against them and proved undue burden, and the Court will not order them to comply with plaintiffs' requested expanded search.

### B. Modification of Plaintiffs' Search Request [9]

██ "[M]odification of a subpoena is generally preferred to outright quashing." *Linder v. NSA*, 94 F.3d 693, 698 (D.C.Cir.1996); *Northrop*, 751 F.2d at 403. Both agencies have suggested performing a search for the following documents (based on category 7 of plaintiffs' proposed expanded search):

> All documents generated between April 1, 1986, and April 30, 1988, concerning the policies and practices of the following contra organizations towards civilians, wounded, prisoners of war, and foreigners working in Nicaragua:
>
> Nicaraguan Democratic Force
> Unified Nicaraguan Opposition
> Nicaraguan Resistance.

It appears to the Court, however, that this proposed modification is too narrow.[10] In order to prove the second and third theories of plaintiffs' case, they need evidence that the contra groups were organized in such a way that the leaders of the groups may be held responsible for the actions of their underlings. Searches previously undertaken by the agencies are unlikely to have generated information about the command structure of the contra organizations. Accordingly, the Court concludes that, in addition to the aforementioned search, the agencies shall perform a search for:

> All documents generated between April 1, 1986, and April 30, 1988, concerning the command structure of the following contra organizations:
>
> Nicaraguan Democratic Force
> Unified Nicaraguan Opposition
> Nicaraguan Resistance.[11]

The Court is aware that this modified search will predominantly capture documents relevant to the second and third theories of plaintiffs' case, not the first theory directly linking defendants to Benjamin Linder's death. The Court concludes, however, that another search for documents directly linking defendants to the alleged crime is unnecessary. Both agencies have already performed searches which should have uncovered almost all documents relevant to the first theory of plaintiffs' case. *See* Mem. Or. of Dec. 12, 1994, at 3. Although a search similar to that ordered in 1994 with expanded time limitations possibly could lead to the discovery of a few more relevant documents, the Court concludes that this chance is not great enough to justify the resources which would be required to perform such a search.

### C. The Agencies' Requests that Plaintiffs Pay for Half of Any Search Ordered

██ Both agencies also contend that plaintiffs should have to pay for half of the ex-

---

9. Although the agencies offered a suggestion for a modified search, plaintiffs did not, and thus the Court was forced to modify the requested search without the benefit of any input from plaintiffs. Plaintiffs had an opportunity to respond to the agencies' proposed modification, or suggest one of their own as an alternative, in their replies. Instead, plaintiffs chose to use their replies to describe in detail the agencies' alleged bad faith and failure to negotiate the scope of the search. Whether plaintiffs have or have not suggested more limited searches to the agencies, the Court does not know. What the Court does know is that plaintiffs did not present any such suggestions to the Court so that it could evaluate their reasonableness. Moreover, plaintiffs cannot blame the agencies' alleged refusal to provide plaintiffs with a description of their databases for plaintiffs' failure to present to the Court even simple modifications, such as the use of time limitations, to make their requested search more reasonable.

10. The agencies' proposal is identical to the modified search the Court ordered in the cases involving the CIA and the FBI. *See Linder II*, 180 F.R.D. at 176. In those cases, however, plaintiffs were only entitled to search for documents "concerning the policy and practice of defendants' forces toward civilians, wounded, prisoners of war and foreigners working in Nicaragua," due to the limited scope of remand. *Id.* at 173. There is no such limitation in these cases.

11. The Court held that this category of information was beyond the scope of remand in *Linder II*, because a search for information about the command structure of the contra organizations would not generate any information about the "human rights" policies of the contra organizations. *See Linder II*, 180 F.R.D. at 173.

penses of a search, in order to protect the agencies from "significant expense" in accordance with Federal Rule of Civil Procedure 45. Rule 45(c)(2)(B) states that "an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded." Thus, because the agencies are not parties to the underlying lawsuit and have made timely motions, the Court concludes that it must protect them from the significant expense necessitated by plaintiffs' search request.[12] See In re Midlantic Corp. Shareholder Litigation, 1994 WL 750664 at *6 (D.D.C.1994); In re Exxon Valdez, 142 F.R.D. 380, 383 (D.D.C.1992); Standard Chlorine of Delaware, Inc. v. Sinibaldi, 821 F.Supp. 232, 264–65 (D.Del.1992); see also Tutor–Saliba Corp. v. United States, 32 Fed.Cl. 609, 611–12 (1995) (holding that when a nonparty indicates its intention to seek costs as a condition to responding to a subpoena, if the court orders the nonparty to comply, its order must protect the nonparty from significant expense).

 "[P]rotection from significant expense does not mean that the requesting party necessarily must bear the entire cost of compliance." Exxon Valdez, 142 F.R.D. at 383. Relevant factors in determining how much of the expense of production the requesting party should bear include whether the non-party actually has an interest in the outcome of the case, whether the non-party can more readily bear its costs than the requesting party, and whether the litigation is of public importance. Id. (citing cases). Although it is permissible to require a plaintiff to bear the full cost of a non-party government agency's compliance with a subpoena, see Midlantic Corp., 1994 WL 750664, at *6 (requiring plaintiff to pay the reasonable copying and labor costs related to the Office of the Comptroller of Currency's compliance with a nonparty subpoena), in light of the agencies' resources and the significance of plaintiffs' Florida litigation, the Court concludes that conditioning the agencies' compliance with the modified search on plaintiffs' payment of half the reasonable copying and labor costs will sufficiently protect them from "significant expense."

Plaintiffs contend that any conclusion as to costs is premature because the Court "has neither given the parties an opportunity to submit evidence, nor articulated any findings of fact that would substantiate a determination as to whether 'the nonparty can more readily bear its costs than the requesting party.'" Pls.' Reply to DoD's Response to Pls.' Mot. for Exp. Search, at 15–16 (quoting Exxon, 142 F.R.D. at 383); Pls.' Reply to DoS's Response to Pls.' Mot. for Exp. Search, at 15–16. As an initial matter, the Court notes that plaintiffs could have submitted evidence about their ability to bear some of the costs of the search with their reply briefs.[13] They can only fault themselves for failing to take advantage of this opportunity. Regardless, even if plaintiffs were to submit evidence showing that plaintiffs have few financial resources, this would not change the Court's conclusion. As the preceding discussion demonstrates, the Court has already given plaintiffs the benefit of the doubt and assumed that they do not have even close to the financial resources of the DoD or the DoS. Nevertheless, the Court concludes that it is appropriate to order plaintiffs to bear at least half of the costs of the searches. In addition to keeping nonparties from "being forced to subsidize an unreasonable share of the costs of a litigation to which they were not a party," United States v. Columbia Broadcasting Sys., Inc., 666 F.2d 364, 371 (9th Cir.1981), cert. denied, 457 U.S. 1118, 102 S.Ct. 2929, 73 L.Ed.2d 1329 (1982), Rule 45's mandatory cost-shifting provisions promote the most efficient use of resources in the discovery process. When nonparties are forced to pay the costs of discovery, the requesting party has no incentive to deter it

12. "The mandatory language of this Rule represents a clear change from old Rule 46(b), which gave district courts discretion to condition the enforcement of subpoenas on the petitioner's paying for the costs of production." In re Exxon Valdez, 142 F.R.D. 380, 383 (D.D.C.1992).

13. Plaintiffs should have known, even before the agencies filed their requests for costs in these cases, that such a request was likely in light of the CIA's request, and this Court's subsequent Opinion in Miscellaneous Case No. 94–146.

from engaging in fishing expeditions for marginally relevant material. Requesters forced to internalize the costs of discovery will be more inclined to make narrowly-tailored requests reflecting a reasonable balance between the likely relevance of the evidence that will be discovered and the costs of compliance.[14]

Accordingly, the Court will order the DoD and the DoS to comply with the search as modified on the condition that plaintiffs pay for half the cost of the searches. To this end, within 30 days of the date of this Opinion, the DoD and the DoS shall provide plaintiffs with a detailed estimate of the cost of complying with the modified search. Fourteen days thereafter, the parties shall file a joint statement with the Court either (1) proposing a schedule for the retrieval, review, and processing of documents responsive to the search as modified, (2) informing the Court that plaintiffs plan to file objections to the cost estimates, and providing a proposed briefing schedule, or (3) suggesting a further reduction of the search or informing the Court of plaintiffs' intention to abandon any further searches in light of the cost. *See Romano v. United Parcel Service General Services Co.*, 1996 WL 684467 at *5 (D.Or. 1996) (requiring the nonparty to provide a good faith estimate of the cost of production to plaintiffs who "may then reduce the scope of the request if they so desire").

## II. *Motion To Deny Claims of Privilege by the DoD and the DoS*

### A. DoD

In the DoD's response to plaintiffs' motion, it states that:

DoD undertook to conduct a declassification review of the documents [previously determined to be classified] and have now released relevant portions of the documents to the plaintiffs. Plaintiffs' counsel, Gabor Rona, Esq., has indicated that plaintiffs will review the documents and raise any further concerns about the redactions with the Court, if necessary.

DoD Resp. to Pls' Mot. For Expanded Search, at 2. Plaintiffs have not disputed this statement or indicated that they intend to challenge the remaining redactions from the documents. Accordingly, the Court denies as moot plaintiffs' motion to deny the DoD's privilege claims and order production of the documents.

### B. DoS

The DoS's response indicates that the agency has withheld one document in full and small portions of another document. Plaintiffs have not indicated that there are any other documents which have been withheld to which they object. Accordingly, the Court presumes that these are the only remaining disagreements over privilege arising out of the first search.

#### 1. Attorney–Client, Work Product, and Deliberative Process Privilege [15]

■ The document withheld in its entirety is described as "a legal memorandum clearly marked 'Attorney–Client Work Product', dated August 13, 1987, 5 pages[ ], and is entitled 'Recent Developments Concerning the Linder Death.'" Albright Decl. ¶ 9. It "represent[s] the candid advice of counsel with respect to how the Department should manage its dealings with the Linder family and their legal counsel." *Id.* The Secretary of State asserts the attorney-client, work product, and deliberative process privileges on

14. Plaintiffs are correct in their observation that "a nonparty can be required to bear some or all of its expenses where the equities of a particular case demand it." *Exxon*, 142 F.R.D. at 383. The cases cited by plaintiffs do not, however, support their contention that plaintiffs should be excused from paying any of the costs of compliance if they are found to have meager financial resources. Plaintiffs' cases share two characteristics which are absent here: (1) those cases were decided before the 1991 amendments to Rule 45, when an award of costs to a nonparty was discretionary, and (2) in each of those cases,

the court determined that the nonparty had an interest in the litigation. *See, e.g., United States v. International Business Machines Corp.*, 62 F.R.D. 507, 509 (S.D.N.Y.1974).

15. Plaintiffs do not mention documents withheld pursuant to the attorney-client, work product, or deliberative process privilege in their motion, nor do they respond to the DoS's arguments on the subject. The Court nonetheless engages in a full analysis of the withheld document, having before it all the necessary information.

behalf of the DoS with respect to this document. *Id.* ¶¶ 10–12.

 It is clear from the Albright Declaration that the DoS has properly withheld this document pursuant to all three privileges. The key factor in evaluating whether an agency has properly invoked the work-product privilege is whether "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *In re Sealed Case,* 146 F.3d 881 (D.C.Cir. 1998) (internal quotation omitted); *see also* Fed.R.Civ.P. 26(b)(3). Albright explains that "[a]t the time that memorandum was written, the Department was on notice of a possible lawsuit by the Linder family, and . . . . [t]hroughout the body of the memorandum, the Legal Adviser provides advice to the Secretary predicated on the likelihood of litigation actually commencing against the Department." Albright Decl. ¶ 10.

 The attorney-client privilege "protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services," including such communications from an agency to the agency lawyer. *Tax Analysts v. Internal Revenue Serv.,* 117 F.3d 607, 618 (D.C.Cir.1997). This privilege also applies to the document because it "consists of legal advice, legal analysis, and recommendations provided to the Secretary in anticipation of litigation" by the Legal Adviser. Albright Decl. ¶ 11.

Finally, the deliberative process privilege, which protects material which is both "predecisional" and "deliberative" in nature, *Hinckley v. United States,* 140 F.3d 277, 284 (D.C.Cir.1998), applies because the memorandum contains "recommendations . . . with respect to how the Department should manage its dealings with the Linder family and their legal counsel. . . . [and] also discusses what next steps the Department should take with respect to a possible Department investigation of Mr. Linder's death." Albright Decl. ¶ 9.

Plaintiffs also request that the Court consider redaction of privileged sections of the documents as an alternative to withholding the entire document. The DoS states that the "Legal Adviser's views and recommendations, as well as the basis for those views and recommendations, are discussed throughout the body of the memorandum," Albright Decl. ¶ 9, and concludes that "no further segregation of meaningful information in the withheld material can be made without disclosing information warranting privileged protection." *Id.* ¶ 14. The Court finds that no meaningful redactions from the document may be made.

## 2. State Secrets Privilege

 "It is now well established that the United States, by invoking its state secrets privilege, may block discovery in a lawsuit of any information that, if disclosed, would adversely affect national security." *Ellsberg v. Mitchell,* 709 F.2d 51, 56 (D.C.Cir. 1983), *cert. denied,* 465 U.S. 1038, 104 S.Ct. 1316, 79 L.Ed.2d 712 (1984). In order to invoke the privilege, " '[t]here must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer.' " *Id.* at 56–57 (quoting *United States v. Reynolds,* 345 U.S. 1, 7, 73 S.Ct. 528, 97 L.Ed. 727 (1953)). Moreover:

> [I]n situations in which close examination of the government's assertions is warranted, [i.e. when a litigant has shown a strong need for the requested information and the surrounding circumstances do not render "self-evident" the harms likely to follow from disclosure,] the trial judge should insist (1) that the formal claim of privilege be made on the public record and (2) that the government either (a) publicly explain in detail the kinds of injury to national security it seeks to avoid and the reason those harms would result from revelation of the requested information or (b) indicate why such an explanation would itself endanger national security.

*Id.* at 63–64 & n. 53. "[T]he trial judge should accord considerable deference to recommendations from the executive department. . . . a showing of 'reasonable danger' that harm will ensue is sufficient." *Id.* at 58.

After personally reviewing a cable from the U.S. Embassy in Managua, Nicaragua, identified as "*Managua 2918*, Confidential, May 4, 1987, Document [N]o. E80", the Secretary of State formally claimed the state secrets privilege to protect the source's name and journalistic affiliation. Albright Decl. ¶¶ 2–5. She avows that the information in the cable was provided on a "not-for-attribution" basis, *id.* ¶ 4 and explains that:

Information provided to the Department of State in this manner provides an important source of intelligence on which I and other officials at the Department rely in carrying out our respective foreign policy duties.... In the conduct of U.S. foreign relations and activities abroad, confidential communications can often be essential. In some situations, exchanges of information provided under a presumption, and with an expectation, of confidentiality can take place through normal diplomatic discussions or through special channels, including non-governmental channels. Information thus obtained can be extremely important to protecting and promoting U.S. interests abroad. Violation of such confidentiality by disclosing, either voluntarily by the Department of State or by order of the Court, the identities of confidential sources or the information they provide, as the case may be, will provoke those who provide such information to regard U.S. officials as unable or unwilling to preserve and respect their confidences. In this case ... [disclosure of the source's name] would deprive the United States Government of valuable information necessary for the formulation and conduct of U.S. foreign policy and foreign relations, and would necessarily damage national security.

*Id.* at ¶¶ 5–7.

Even assuming *arguendo* that plaintiffs have shown a compelling need for the information in the cable, the Court concludes that the DoS has properly invoked the state secrets privilege in order to protect the nation's intelligence-gathering capabilities.[16]

*See Ellsberg,* 709 F.2d at 57. The DoS has formally invoked the privilege on the public record and publicly explained the kinds of injuries to national security it seeks to avoid. *See id.* at 63–64 (setting forth the requirements the government must meet when plaintiffs have shown a compelling need). Although plaintiffs' need for the information means that the Court must probe the government's explanations of the potential danger to national security more deeply, once the Court is satisfied that the redacted information could reasonably endanger national security and that the government has met the requirements for invocation of the privilege, the inquiry is at an end. "When properly invoked, the state secrets privilege is absolute. No competing public or private interest can be advanced to compel disclosure of information found to be protected by a claim of privilege." *Id.* at 57; *see also In re United States,* 872 F.2d 472, 476 (D.C.Cir.), *cert. dismissed,* 493 U.S. 960, 110 S.Ct. 398, 107 L.Ed.2d 365 (1989).

The DoS further explains that only "[t]wo small portions of the cable have been withheld to protect the source's name and journalistic affiliation; in all other respects, the cable, as provided to the plaintiffs, reports verbatim the information provided by the source to the Embassy officers." Albright Decl. ¶ 5; *see also id.* at ¶ 14. Thus, the Court concludes that the DoS has disclosed as much information as possible from the document without endangering national security. *See Ellsberg,* 709 F.2d at 57 ("[W]henever possible, sensitive information must be disentangled from nonsensitive information to allow for the release of the latter.").

### CONCLUSION

For the foregoing reasons, the Court denies in part and grants in part plaintiffs' motion for an expanded search, as modified. The Court denies plaintiffs' motion for denial of claims of privilege by the DoD and the DoS and for production of documents identified in any previous search by the DoD and

---

**16.** The Court observes that plaintiffs have not made any specific objections to the comprehensiveness or substance of the Albright declaration; they did not address the Albright declaration or the privilege issue in their reply.

the DoS. An appropriate Order for each case accompanies this Opinion.

## Misc. No. 94–147 SSH

### *ORDER*

For the reasons stated in the accompanying Opinion, it hereby is

ORDERED, that plaintiffs' motion requesting denial of claims of privilege by the Department of Defense ("DoD") and for production of documents identified in any previous search by the DoD is denied. It hereby further is

ORDERED, that plaintiffs' motion for an expanded search is denied in part and granted in modified part. It hereby further is

ORDERED, that, on the condition that plaintiffs pay half the reasonable costs of the search, the DoD shall perform a search for the following documents:

All documents generated between April 1, 1986, and April 30, 1988, concerning the policies and practices of the following contra organizations towards civilians, wounded, prisoners of war and foreigners working in Nicaragua:

Nicaraguan Democratic Force

Unified Nicaraguan Opposition

Nicaraguan Resistance;

All documents generated between April 1, 1986, and April 30, 1988, concerning the command structure of the following contra organizations:

Nicaraguan Democratic Force

Unified Nicaraguan Opposition

Nicaraguan Resistance.

It hereby further is

ORDERED, that within 30 days of the date of the accompanying Opinion and this Order, the DoD shall provide plaintiffs with a detailed estimate of the cost of complying with the modified search. It hereby further is

ORDERED, within 14 days after the DoD has provided an estimate to plaintiffs, the parties shall file a joint statement with the Court either (1) proposing a schedule for the retrieval, review, and processing of documents responsive to the search as modified, (2) informing the Court that plaintiffs plan to file objections to the cost estimates, and providing a proposed briefing schedule, or (3) suggesting a further reduction of the search or informing the Court of plaintiffs' intention to abandon any further searches in light of the cost.

SO ORDERED.

## Misc. No. 94–150 SSH

### *ORDER*

For the reasons stated in the accompanying Opinion, it hereby is

ORDERED, that plaintiffs' motion requesting denial of claims of privilege by the Department of State ("DoS") and for production of documents identified in any previous search by the DoS is denied. It hereby further is

ORDERED, that plaintiffs' motion for an expanded search is denied in part and granted in modified part. It hereby further is

ORDERED, that, on the condition that plaintiffs pay half the reasonable costs of the search, the DoS shall perform a search for the following documents:

All documents generated between April 1, 1986, and April 30, 1988, concerning the policies and practices of the following contra organizations towards civilians, wounded, prisoners of war and foreigners working in Nicaragua:

Nicaraguan Democratic Force

Unified Nicaraguan Opposition

Nicaraguan Resistance;

All documents generated between April 1, 1986, and April 30, 1988, concerning the command structure of the following contra organizations:

Nicaraguan Democratic Force

Unified Nicaraguan Opposition

Nicaraguan Resistance;

It hereby further is

ORDERED, that within 30 days of the date of the accompanying Opinion and this Order, the DoS shall provide plaintiffs with a detailed estimate of the cost of complying with the modified search. It hereby further is

ORDERED, within 14 days after the DoS has provided an estimate to plaintiffs, the parties shall file a joint statement with the Court either (1) proposing a schedule for the retrieval, review, and processing of documents responsive to the search as modified, (2) informing the Court that plaintiffs plan to file objections to the cost estimates, and providing a proposed briefing schedule, or (3) suggesting a further reduction of the search or informing the Court of plaintiffs' intention to abandon any further searches in light of the cost.

SO ORDERED.