**In re The EXXON VALDEZ.**

**Misc. A. No. 92–98.**

United States District Court,
District of Columbia.

May 11, 1992.

Michael Hausfeld, Charles S. Crandall, for petitioners.

Daniel Joseph, Mary T. Hughes, Akin, Gump, Hauer & Feld, Washington, D.C., (Alan Friedlander, Am. Petroleum Institute, Washington, D.C., of counsel), for respondent.

William D. Temko, on behalf of Alyeska Pipeline Service Corp., Milberg Weiss Bershad Specthrie & Lerach, Charles S. Crandall and Thomas D. Mauriello, San Diego, Cal.

Milberg Weiss Bershad Specthrie & Lerach, Melvyn I. Weiss, Jerome M. Congress, and Steven R. Weinmann, New York City, Co–Chairmen, Law Committee.

Davis Wright Tremaine and David W. Oesting, Anchorage, Alaska.

Cohen, Milstein, Hausfeld & Toll, Jerry S. Cohen, Washington, D.C. and Sonosky, Chambers, Sachse & Miller Lloyd Benton Miller, Anchorage, Alaska, for plaintiffs.

Douglas Serdahely, Bogle & Gates, Anchorage, Alaska.

Martha J. Dawson, Preston Thorgrimson Shidler & Ellis, Anchorage, Alaska.

Peter Kahana, Berger & Montague, Philadelphia, Pa.

Charles P. Flynn, Burr Pease & Kurtz, Anchorage, Alaska.

John E. Daum, O'Melveny & Myers, Los Angeles, Cal.

## MEMORANDUM

OBERDORFER, District Judge.

Petitioners are five classes of private plaintiffs who, along with the State of Alaska, have sued Exxon Corporation and Alyeska Pipeline Service Company ("Alyeska")[1] in parallel federal and state court actions in Alaska. Here they move for an order enforcing a non-party subpoena, issued on the authority of this court, which sought production of documents in the possession of the American Petroleum Institute ("API"), a Washington-based trade association. Petitioners also seek to tax API with the costs of complying with the subpoena, as well as with sanctions on account of API's alleged bad faith in failing to comply. API opposes enforcement, arguing that the documents are available from the defendants themselves and should be sought from them; that the newly-amended Federal Rule of Civil Procedure 45(c) requires the petitioners to bear the costs of compliance; that some documents are protected by a First Amendment privilege; and that API has acted in good faith and should not be sanctioned. Alyeska has appeared by counsel to oppose the motion; Exxon has been conspicuously silent. The briefs filed by the parties and the oral arguments of their counsel persuade me that the subpoena should be enforced in full, but that the special circumstances of this case require API to bear a portion of the costs equal to the percentage of contributions or dues that API receives which are derived from the Alaska defendants, including the oil company principals of Alyeska.

## I.

On January 28, 1991, petitioners served the instant subpoena on API. The subpoena seeks industry documents which petitioners claim would tend to show that both Exxon Corporation and Alyeska, the primary defendants in the *Exxon Valdez* litigation, could have taken certain measures to prevent, contain, or mitigate the effects of the widely-publicized oil spill near Valdez, Alaska, which gave rise to this litigation. On February 8, 1991, API formally objected to the scope of the subpoena, commencing a period of negotiation between the petitioners and API over both the scope and the costs of production.[2] These negotiations appeared to yield an interim solution to the discovery dispute on July 24, when

---

1. Alyeska is a consortium of seven pipeline companies owned by Amerada Hess Corporation, ARCO, BP America, Exxon, Mobil, Phillips Petroleum, and Unocal Corporation.

2. The record suggests that the other parties in *Valdez* knew of the negotiations from the outset. Petitioners' counsel avers that all parties were served with the subpoena and objections, and that a February 14 phone call between him and API's counsel included the defendants and the State of Alaska. Crandall Decl. ¶ 10. In reply, API's counsel has stated that, other than a brief conversation with an Exxon lawyer, he "did not communicate with any counsel or other representatives of any defendant" before July 31, and that he did not know Alaska was a plaintiff in the suit. Joseph Decl. ¶¶ 3–4.

API notified the petitioners that it would make available a limited production of fifteen boxes of documents on August 1 or 2, leaving for future resolution the issues of costs and the remaining document requests. Respondent's Exh. 11. However, on July 31, the eve of the document production, API informed the petitioners that the *Valdez* defendants had just objected that they had been "excluded by plaintiffs from all participation in the negotiations with respect to the subpoena served on API," and that the production would violate a discovery order in the Alaska court. Respondent's Exhs. 12–13. Accordingly, API cancelled the document production.

On August 1, counsel for the State of Alaska—also a *Valdez* plaintiff—telephoned API's counsel and expressed interest in the subpoenaed documents. Respondent's Exh. 14. API's counsel then wrote all counsel in *Valdez*, asserting that "API had been unaware that Alaska might have an interest in those documents," insisting that further negotiations include "all parties to the underlying litigation who may properly claim an interest in production from API," and demanding that API be compensated for its costs. *Id.* Following further negotiations among petitioners, API, the *Valdez* defendants, and the State of Alaska, API offered to produce all of the unprivileged subpoenaed material if the petitioners paid API's estimated costs of $30,-000 for locating and producing the material. Without such payment, API's position was that it would produce only the fifteen boxes already compiled. *See* Joseph Decl. ¶¶ 23–24. On March 3, 1992, petitioners filed the present action, seeking full enforcement of the subpoena.

At the April 29 hearing, API's counsel reiterated his claim that the State of Alaska's entry into the negotiations had come as a surprise because "there was never any suggestion that there were additional plaintiffs" in the *Valdez* litigation, Tr. 16–17, and that that phone call, coupled with the defendants' objections, was what led API to change its position on the scheduled production. Tr. 21–23. More generally, he represented to the Court that "API had practically nothing to do with this litiga-tion," Tr. 18; that most of API's members "have no direct, or really even indirect, interest in the outcome of the *Valdez* case," Tr. 29–30; and that "this is a lawsuit that involves, by number, a very small part of the oil industry. It involves two companies." Tr. 32. Following the hearing, at the Court's request, API filed a notice stating that the dues paid API by Exxon, Alyeska, and Alyeska's corporate principals constituted 29 percent of API's 1992 income.

## II.

API argues that since it is a membership organization charged with disseminating information to its members, "the vast majority" of the documents sought by petitioners can be obtained from the *Valdez* defendants, both of which are API members. It recites the general proposition that discovery should be restricted if it can be had from a "more convenient, less burdensome, or less expensive" source, Fed.R.Civ.P. 26(b)(1), and argues that this applies with particular force in the case of non-parties, who also are protected from "undue burden or expense" by newly-amended Rule 45. *See* Fed.R.Civ.P. 45(c)(1); *Konstantopoulos v. Westvaco Corp.*, 1991 WL 269606, 1991 U.S.Dist.LEXIS 17760 (D.Del. Dec. 13, 1991). API thus concludes that, at a minimum, petitioners first must attempt to compel production from the *Valdez* defendants in the Alaska court. API also maintains that for certain documents, notably those underlying an industry report on the spill, there are other *non*-parties who would prove better sources than API.

■ The problem with this argument is that it is far from obvious that obtaining discovery on these issues elsewhere would in fact be more convenient, less burdensome, or less expensive than obtaining it directly from API. Since API's own exhibits admit that it is a repository of technical information, including safety information, for the entire petroleum industry, *see* Friedlander Decl. ¶¶ 6–8, the burden it would incur in responding to petitioners' discovery request could easily be less than

that faced by Exxon or Alyeska. Moreover, it is impossible to consider issues of "undue burden or expense" in the abstract, divorced from the question of which party will bear that burden or expense. If the Court were to decide that the petitioners must bear all costs, then API would have no basis for objections based on burden or expense to it. Only if the costs were borne by API would it become necessary to weigh them against the equivalent costs that would be borne by Exxon and Alyeska if the petitioners were to seek the documents from them.

■ As for the assignment of cost, API cites new Rule 45(c)(2)(B), which states that "an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded." The mandatory language of this Rule represents a clear change from old Rule 45(b), which gave district courts *discretion* to condition the enforcement of subpoenas on the petitioner's paying for the costs of production. Although the present subpoena was issued before the Rule became effective on December 1, 1991, this motion was filed after that date. The implementing order for the 1991 Amendments to the Rules states that they "shall govern all proceedings in civil actions thereafter commenced and, insofar as just and practicable, all proceedings in civil actions then pending." Supreme Court Order of April 30, 1991. Thus, no matter which date is taken as the commencement of this litigation, new Rule 45(c) should apply. Accordingly, any order requiring API to comply with the subpoena must also require that API, ostensibly a non-party to the *Valdez* litigation, be "protect[ed] ... from significant expense" in producing the requested documents.[3]

However, "protection from significant expense" does not mean that the requesting party necessarily must bear the *entire* cost of compliance, particularly where, as here, doubt has been cast on the subpoenaed party's status as a non-party. While the drafters of new Rule 45 clearly intended to expand the protection for non-parties such as disinterested expert witnesses, *see* Advisory Committee Note to 1991 Amendment, there is no indication that they also intended to overrule prior Rule 45 case law, under which a non-party can be required to bear some or all of its expenses where the equities of a particular case demand it. *E.g., United States v. International Business Mach. Corp.,* 62 F.R.D. 507 (S.D.N.Y.1974). Under that case law, it is relevant to inquire whether the putative non-party actually has an interest in the outcome of the case, *Pollitt v. Mobay Chem. Corp.,* 95 F.R.D. 101, 105 (S.D.Ohio 1982); whether it can more readily bear its costs than the requesting party, *id.;* and whether the litigation is of public importance. *Westinghouse Elec. Corp. v. City of Burlington,* 351 F.2d 762 (D.C.Cir. 1965); *United States v. International Business Mach. Corp.,* 62 F.R.D. 526, 529 (S.D.N.Y.1974).

■ Here, despite API's repeated attempts to distance itself from the *Valdez* litigation, it is clear that API and its members do have an actual interest in the outcome of that litigation. API's own documents reveal that it "represents over 250 companies involved in all aspects of the oil and gas industry." Respondent's Exh. 5. At the hearing, API's counsel argued, somewhat disingenuously, that since the *Valdez* litigation affects only a small number of those 250 members, it is of little interest to API's other members or to the

---

**3.** Petitioners claim that new Rule 45 distinguishes between the costs of production and costs of "inspection and copying," and only provides protection against the latter costs. This reading of the Rule is too narrow. The Advisory Committee's Note to the Amendment states that non-parties should be "protected against significant expense resulting from involuntary assistance to the court." If, as petitioners have argued, the costs of production are the most

expensive component of API's claimed costs, then that is all the more reason to provide protection against them.

Petitioners also argue it would not be "just and practicable" to apply the new Rule here because API allegedly delayed production in order to take advantage of the new Rule's benefits. Even under the old Rule, however, the Court would have discretion to assign costs in the proportion that is described below.

organization as a whole. Tr. 29–32. However, API's admission that 29 percent of its income comes from the *Valdez* defendants and their corporate principals weakens API's claim that it acted solely as a neutral third party during the negotiations, sheds some light on its immediate decision to cancel the production once the *Valdez* defendants openly objected, and materially distinguishes API from the pure non-party witness identified in Rule 45. Moreover, even if the relationship between API and the *Valdez* defendants were less substantial, it seems certain that the precedential value of the *Valdez* case is a matter of real concern to a large portion of the petroleum industry. Nor has API denied that this suit is of great public importance generally.

Further, there can be little doubt that API, which in 1989 had gross receipts of $58 million and a net worth of $17 million, *see* Petitioners' Exh. B, would be able to absorb at least some of the costs of production and copying.[4] *Wilk v. American Medical Ass'n*, 28 Fed.R.Serv.2d 580 (D.D.C.1979) (given non-party professional association's "obvious and understandable substantial interest in the outcome," costs of compliance held to be "business overhead"). This is especially true in comparison with the financial situation of petitioners, who are five disparate classes of Native Alaskans, fishermen, business persons, property owners, and cannery workers affected by the spill.[5] Thus, although new Rule 45(c) does require petitioners to bear the major portion of the costs of producing and copying the documents, API equitably should bear 29 percent of the total cost, the same percentage as the proportion of API's income attributable to dues paid by the defendants and their principals. This figure takes into account the special circumstances recited above, while still ensuring that API could easily and sufficiently protect itself from significant expense within the meaning of the Rule, by simply assessing this special expense to the defendants, who are its members and a principal source of its revenue.

III.

■ API argues that to the extent that the subpoena seeks material related to API's lobbying efforts on several federal and state laws and regulations affecting the petroleum industry, such material is privileged by the First Amendment right to petition for redress of grievances. It cites *Australia/Eastern U.S.A. Shipping Conference v. United States*, 537 F.Supp. 807, 810 (D.D.C.1982), which held that the "forced disclosure of first amendment activities creates a chilling effect which must be balanced against the interests in obtaining the information." API asserts that petitioners here do not have a sufficient need for the lobbying information to overcome the chilling effect of disclosure, and that they again have not shown that the material is not available from alternative sources.

Petitioners respond that the documents are relevant to whether the industry actively lobbied against the same preventive measures, such as double-hulled tankers and oil spill contingency plans, that are at issue in *Valdez;* in particular, they claim that the evidence is critical to their punitive damages claims. Petitioners concede, however, that they have sought these documents directly from the *Valdez* defendants, who refused on the same First Amendment grounds as API, and that they have not sought a decision on that privilege claim from the special master who is supervising discovery for the Alaska court. Under these circumstances, it would be inappropriate for me to rule on the privilege question; it should be decided by the special discovery master or the supervising court in Alaska. Accordingly, the Order enforc-

---

4. Indeed, at the hearing, API's counsel conceded that API had already spent more than $30,000 on this litigation alone. Tr. 26.

5. For this reason, *United States v. Columbia Broadcasting Sys., Inc.*, 666 F.2d 364 (9th Cir.), *cert. denied*, 457 U.S. 1118, 102 S.Ct. 2929, 73 L.Ed.2d 1329 (1982), is distinguishable. There, the court remanded to the district court for a statement of its reasons for taxing $2.3 million in discovery costs to a nonparty, noting that "large nonparty corporations ... should not be compelled to subsidize the defense of other large corporations." *Id.* at 372.

ing the subpoena is without prejudice to API's withholding the documents which are the subject of its privilege claim unless and until the Alaska court rules that these or similar documents which are the subject of defendants' privilege claim do not enjoy a privilege.

### IV.

 Finally, petitioners argue that given the extraordinary delay and API's alleged bad faith in failing to comply with the subpoena, they should be awarded costs and attorney fees of this action under Rule 37(a)(4) or the Court's inherent equitable powers. However, Rule 37 by its terms applies only to a motion to compel production from a party under Rule 34. Fed.R.Civ.P. 37(a)(2), 37(a)(4). Rule 34 in turn now provides that motions to compel production from non-parties are governed by Rule 45. Fed.R.Civ.P. 34(c). The only sanction provision in Rule 45 is the contempt provision, which has no application here, where API timely objected to the subpoena. *Pennwalt Corp. v. Durand–Wayland, Inc.*, 708 F.2d 492, 494 (9th Cir. 1983). At that point, it was petitioners' obligation to obtain an order compelling production, *see* Fed.R.Civ.P. 45(c)(2)(B), which they did not attempt to do for more than a year. Thus, the Federal Rules provide no basis for awarding sanctions in this case.

 For similar reasons, petitioners' "inherent powers" argument also must fail. Such an award of sanctions is only proper upon a showing of bad faith. *See Pennwalt*, 708 F.2d at 494. The evidence in the record indicates that, at least from February through July of last year, the negotiations between API and the petitioners were conducted relatively cordially and in good faith. *See* Respondent's Exhs. 4–11. Indeed, there is some suggestion in the correspondence that the petitioners themselves may have caused or agreed to some portion of the initial delay. Respondent's Exh. 9. On the other hand, in the absence of proof to the contrary in an evidentiary hearing after discovery and cross-examination, the representations of API's counsel that—in

this highly-publicized litigation with dire implications for API's most significant members—API simply was ignorant of the fact that the State of Alaska was a plaintiff or was unaware, until July 31, that the *Valdez* defendants opposed API's honoring of the subpoena, are not cognizable. Accordingly, neither party should prevail on the cost issue; each side must bear its own costs. An appropriate Order accompanies this Memorandum.

### ORDER

Upon consideration of the petition to enforce the subpoena *duces tecum* served on respondent American Petroleum Institute ("API"), the opposition and reply memoranda thereto, and for the reasons stated in the Court's Memorandum of this date, it is hereby

ORDERED, that the petition is GRANTED, and the subpoena shall be enforced immediately, except with respect to those documents for which API has claimed a First Amendment privilege. It is further

ORDERED, that API's reasonable costs of compliance, including the costs of producing, inspecting, and photocopying the requested documents, shall be divided between the petitioners and API in the proportion of 71 percent to 29 percent, respectively. It is further

ORDERED, that petitioners' request for costs and attorney fees in connection with the present petition is DENIED.

IT IS SO ORDERED.