**In the Matter of the Petition of FIRST AMERICAN CORPORATION and First American Bankshares, Inc., Petitioners,**

**for an Order Compelling Price Waterhouse and Price Waterhouse C/O Clive D.J. Newton, to Comply with Subpoenas,**

**v.**

**Price Waterhouse LLP, a limited liability partnership registered under the laws of the State of Delaware, and Price Waterhouse United Kingdom Firm, a partnership organized under the laws of England, United Kingdom, Respondents.**

**No. M8–85 RWS.**

United States District Court, S.D. New York.

Dec. 23, 1998.

Jones, Day, Reavis & Pogue, New York, By Steven C. Bennett, Esq., Bonnie L. Hemenway, Esq., Of Counsel, Jones, Day, Reavis & Pogue, Washington, DC, By Stephen J. Brogan, Esq., Christopher F. Dugan, Esq., Of Counsel, for Petitioners.

. Dechert Price & Rhoads, New York, By James E. Tolan, Esq., Peter L. Critchell, Esq., Amianna Stovall, Esq., Of Counsel, for Respondents.

## OPINION

SWEET, District Judge.

Price Waterhouse–United Kingdom ("PW–UK") has moved pursuant to Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure for the reimbursement of costs in the amount of $210,990.67 incurred in obtaining the United Kingdom ("UK") and Cayman court orders lifting the various foreign legal restrictions preventing production of documents responsive to the subpoena issued by this Court. First American Corporation ("FAC") has. moved for a determination of the reasonableness of PW–UK's redaction costs, which PW–UK incurred pursuant to an order issued by the Cayman court. For the reasons set forth below, PW–UK's motion is granted in part and denied in part—specifically, FAC shall reimburse PW–UK in the amount of $75,-

000—and FAC's motion is denied for lack of jurisdiction.

### Parties

FAC is a Virginia corporation with its principal place of business in Washington D.C. During the events which led to the DC Action (defined below), FAC was a privately held bank holding company wholly owned by Credit and Commerce American Holdings Co. N.V. ("CCAH").

PW–UK is an English partnership set up under the Partnership Act (1890) of England. It is located and operates principally in the United Kingdom.

### Facts and Prior Proceedings

The facts and prior proceedings were set forth in detail in three prior opinions, familiarity with which is assumed. *See First American Corp. v. Price Waterhouse LLP,* 988 F.Supp. 353 (S.D.N.Y.1997) [hereinafter *First American I* ]; *First American Corp. v. Price Waterhouse LLP,* No. M8–85, 1998 WL 148421 (S.D.N.Y. Mar. 27, 1998) [hereinafter *First American II* ]; *Price Waterhouse LLP v. First American Corp.,* 182 F.R.D. 56 (S.D.N.Y.1998). Facts relevant to the instant motion are set forth below.

FAC is the plaintiff in an action, which has now largely settled, in the District Court for the District of Columbia, captioned *First American Corp., et al. v. Sheikh Zayed Bin Sultan al-Hahuan, et al,* 93 Civ. 1309 and 95 Civ. 9877 (JUG/PJA) (the "DC Action"). The DC Action was just one proceeding of many spawned by the largest bank fraud in world history perpetrated by the Bank of Credit and Commerce International ("BCCI"). During BCCI's growth to an organization of international proportions, it created fictitious loans, stole deposits, incurred hundreds of millions of dollars in losses from reckless trading operations, accepted illicit funds from drug launderers and corrupt dictators, and blatantly violated banking and criminal laws in virtually every jurisdiction in which it operated. The result was a $10.5 billion bank failure, and the loss of billions of dollars of depositors' savings.

The Price Waterhouse firms were auditors of BCCI (Overseas) Limited, a Cayman Islands bank, and the efforts of separate Price Waterhouse firms were coordinated by PW–UK. As part of its coordination of worldwide audits, PW–UK would instruct and direct the efforts of accounting firms in those territories where BCCI subsidiaries carried on material business.

In August 1997, FAC served a subpoena (the "Subpoena") requesting documents from PW–UK related to BCCI and any services performed by Price Waterhouse for BCCI. The Subpoena was objected to. On September 30, 1997, FAC brought an application by *ex parte* order to show cause compelling discovery. The petition was heard in Part I before this Court on October 28, 1997. In *First American I,* this Court enforced the Subpoena and granted FAC's motion to compel discovery as to PW–UK.

On April 3, 1998, PW–UK was found to be in contempt of court for its failure to comply with the Subpoena enforced by *First American I* and *First American II.* PW–UK was ordered to pay $1,000 per day as a sanction, but pursuant to stipulation by the parties, the sanction was stayed pending the appeal of *First American I, First American II,* and the contempt order to the Second Circuit.

On June 23, 1998, the Second Circuit affirmed *First American I, First American II,* and the contempt order. *See First American Corp. v. Price Waterhouse LLP,* 154 F.3d 16 (2d Cir.1998) [hereinafter *First American III* ].

On July 2, 1998, the sanction for noncompliance of the document subpoena was increased to $5,000 per day.

Both this Court and the Second Circuit recognized that PW–UK's compliance with the Subpoena was complicated by the existence of various foreign legal impediments preventing disclosure of a majority of the responsive documents. *See First American III,* 154 F.3d at 21–23; *First American I,* 988 F.Supp. at 365–66. These impediments included: (1) customer injunctions; (2) banker/customer confidentiality considerations; (3) the implied undertaking as to the use of the documents obtained on discovery in the English BCCI litigation; (4) section 4 of the Cayman Islands Confidential Relationships (Preservation) Law (1995 Revision) ("Cay-

man Confidentiality Law"); (5) section 82 of the UK Banking Act of 1987; and (6) public interest immunity concerns.

Following the affirmance by the Second Circuit, PW–UK engaged the efforts of its English and Cayman counsel towards lifting the above impediments. By July 9, 1998, three of the relevant legal impediments had been resolved without judicial intervention. Regarding the public interest immunity concerns, PW–UK determined that such concerns would not prevent production of documents, and FAC agreed that documents subject to either the implied undertaking on discovery or section 82 of the UK Banking Act of 1987 need not be produced.

The remaining impediments required either the consent of interested parties or judicial resolution. According to PW–UK, because obtaining the multitude of required consents before the August 11, 1998, discovery deadline would be impossible, PW–UK prepared to make expedited applications to the UK and Cayman courts.

Proceedings in the UK and Cayman courts commenced in July 1998. On July 24, 1998, the UK court entered an order permitting PW–UK to disclose documents responsive to the Subpoena, notwithstanding the confidentiality restrictions, contingent upon (1) PW–UK's redaction of all information in such documents relating to the affairs of persons other than the record shareholders of CCAH, and (2) FAC's undertaking to seek protective orders from this Court and the DC district court prohibiting FAC and other parties to the DC Action from using or disclosing such information for any purpose other than the DC Action.

The Cayman court likewise ruled that PW–UK would be permitted to disclose information otherwise subject to confidentiality restrictions pursuant to the Subpoena. In addition to the restrictions imposed by the UK court—redaction and entry of protective orders—the Cayman court order, dated July 26, 1998 ("Cayman Order"), required FAC (1) to pay PW–UK's costs and expenses in complying with the Order ("Costs Undertaking"), and (2) "[t]o use all reasonable endeavors including an application to the New York District Court under Rule 37 of the FRCP

for an order exempting [PW–UK] from any sanction or penalty under the Subpoena provided they have used all reasonable endeavors to make the disclosure authorized by this Order on or before 11th August, 1998." These undertakings were given to the court and FAC confirmed them to PW–UK in correspondence.

PW–UK asserts that it incurred significant expenses in lifting the legal impediments preventing compliance with the Subpoena in the UK and Cayman Islands. Specifically, PW–UK contends that it expended a total of $174,961.26 in making its applications to the UK court. Of this amount, PW–UK expended a total of $124,226.29 on its solicitors' fees (representing 381.9 hours), and a total of $38,414.18 on fees for its counsel (representing 132 hours). An additional $12,320.79 was expended on disbursements. Regarding the application before the Cayman court, PW–UK expended a total of $33,156.25 on its attorneys (representing 78.5 hours) and an additional $2,873.16 on disbursements. PW–UK's total costs in relation to both the UK and Cayman court proceedings thus amounts to $210,990.67.

On September 8, 1998, PW–UK filed its motion for reimbursement of these costs. Oral arguments were heard on October, 7, 1998, at which time the motion was deemed fully submitted.

As part of the motion, PW–UK had moved for an order declaring PW–UK purged of contempt, releasing and discharging it from this Court's contempt order, and vacating any contempt sanctions. At the October 7 oral arguments, this Court proposed a settlement between the parties in which FAC would withdraw its opposition to the contempt-related portions of the motion to vacate in exchange for PW–UK's agreement not to institute contempt proceedings against FAC in the Cayman court for the failure to comply with FAC's separate undertaking to support lifting of contempt sanctions in this Court. It was proposed that this Court retain jurisdiction over two matters: (1) PW–UK's request pursuant to Rule 45(c)(2)(B) that FAC be required to reimburse PW–UK's costs in making the UK and Cayman

applications and (2) any further disputes arising out of this Court's prior Protective Order, prohibiting use of confidential information outside the underlying DC Action. The "core" agreement was embodied in the Stipulation and Order ("Stipulation") signed November 2, 1998.

Having decided to "agree to disagree" on the issue of the review and redaction costs resulting from the foreign orders, under the Stipulation PW–UK reserved its rights to pursue the recovery of the redaction costs. According to PW–UK, FAC was aware that PW–UK would move in the Cayman court to enforce the Costs Undertaking of FAC for such reimbursement.

On November 3, 1998, FAC filed its motion for a determination of the reasonableness of PW–UK's redaction costs. Oral arguments were heard on December 2, 1998. Having received permission to file additional papers, and such papers having been received by December 7, 1998, the motion was deemed fully submitted as of that date.

On November 4, 1998, PW–UK served a summons seeking enforcement of the Costs Undertaking in the Cayman court. In that proceeding (the "Cayman Proceeding"), PW–UK asked the court to find that a figure of £296,332.01 constitutes the "reasonable" costs FAC is required to pay pursuant to the Costs Undertaking. On November 16, 1998, FAC served a cross-summons in the Cayman Proceeding, requesting that the Cayman Proceeding be stayed due to the motion here set forth for oral argument on December 2, 1998. In a directions hearing held on November 17, 1998, the Cayman court set a briefing schedule combing the issues raised on the summons and the cross-summons on a single timetable, with FAC's evidence and any "skeleton" arguments due November 27, 1998, and PW–UK's reply due seven days after that. Oral arguments were set to be held in the Cayman court on December 17, 1998.

On November 27, 1998, FAC asked PW–UK to agree to an extension for FAC's responsive pleading. PW–UK refused and responded on November 30, 1998, stating that it would be making an application to the Cayman court for an order seeking judgment for the amount claimed. As an alternative, PW–UK proposed that FAC agree to an order where FAC would be debarred from defending the claim unless the papers were served by noon on December 1. PW–UK made an application, which was heard forthwith. The Cayman court ordered that unless FAC filed its responsive affidavit by the end of day December 1 and paid a bond in the amount requested by PW–UK, it would be debarred from defending the application. FAC filed its affidavit as ordered but did not pay the bond. Subsequently, a default judgment was entered against FAC on December 2, 1998, by the Cayman court, requiring that FAC pay the sum requested by PW–UK for the redaction exercise.

### Discussion

#### I. Pursuant to Rule 45(c)(2)(B), PW–UK Is Entitled to Reimbursement By FAC for a Portion of the Costs Incurred in Connection With the UK and Cayman Court Applications

Rule 45 requires that a nonparty, subject to an order compelling production, "shall be protected from significant expense resulting from the inspection and copying commanded." Fed.R.Civ.P. 45(c)(2)(B).

Pursuant to the Rule, PW–UK seeks costs totaling $210,990.67 incurred in making the necessary applications in the UK and Cayman courts to lift legal impediments imposed in those jurisdictions so that PW–UK could produce the subpoenaed documents. FAC contends, *inter alia*, that PW–UK has waived any alleged right to recover the fees sought by failing to properly raise the demand both with this Court and with FAC, that PW–UK has failed to meet the legal standard for recovery of any expenses under Rule 45, and that FAC should not be required to pay the costs PW–UK incurred in seeking releases from the UK and Cayman confidentiality laws because PW–UK used the demand for such releases as a way to undermine the Subpoena during those proceedings.

#### A. PW–UK Has Not Waived Its Right to Recover Costs From FAC

According to FAC, PW–UK failed to use the appropriate mechanisms under the

Federal Rules for recovering its expenses. FAC submits that if PW–UK wanted reimbursement for the costs of lifting the legal impediments in the UK and Cayman courts, it should have moved at the start of proceedings—*i.e.*, during FAC's motion to compel production of documents—for an appropriate order under Rules 26(c) or 45.

In support for its proposition that PW–UK's failure to move for such costs at the appropriate time constitutes a waiver under Rule 45(c)(2)(B), FAC cites to *Tutor–Saliba v. United States*, 32 Fed.Cl. 609, 610 (Fed.Cl. 1995), in which the court stated that "[a] nonparty must move to quash the subpoena or otherwise indicate its intention to seek costs before, and as a condition of, responding." However, in that case, the nonparty moving for costs incurred in responding to a subpoena had never made a motion to quash or objected to the subpoena in any way, including making any effort to indicate that it would be seeking reimbursement costs, prior to its compliance. *See id.* at 612.

By contrast, in the instant case, PW–UK raised the issue of costs many times prior to producing the documents. For instance, PW–UK specifically stated in its initial opposition papers on FAC's motion to compel compliance that it should not be required to expend its own money to obtain the waivers of the various legal impediments from the sovereign authorities concerned since those expenses would be considerable. *See In re Letters Rogatory*, 144 F.R.D. 272, 278 (E.D.Pa.1992) (holding that reasonable production costs would be reimbursed where nonparty previously represented to the court in its briefs that "the cost of production may be substantial" but had not fixed the compliance costs prior to production). PW–UK again raised the issue after the appeal (*First American III*) was determined, prior to commencing the production of documents, in a letter notifying the Court that PW–UK was "preparing to institute proceedings to seek the necessary consents in both the UK and Cayman courts." Letter from James E. Tolan to Honorable Robert W. Sweet (June 26, 1998).

Under Rule 45, a nonparty is not rigidly required to seek reimbursement for the costs of compliance prior to responding to a subpoena. Indeed, the Advisory Committee's note to the 1991 amendment of Rule 45 explains that:

> The court is not required to fix the costs in advance of production, although this will often be the most satisfactory accommodation to protect the party seeking discovery from excessive costs. In some instances, it may be preferable to leave uncertain costs to be determined after the materials have been produced, provided that the risk of uncertainty is fully disclosed to the discovering party.

Fed.R.Civ.P. 45(c)(2)(B) advisory committee's note; *see United States v. Columbia Broadcasting Sys.*, 666 F.2d 364, 368 (9th Cir.1982) (recognizing that Rule 45 "has been used creatively to require interim reimbursement [as well as] reimbursement of costs at the conclusion of discovery"); *see generally* David. D. Siegel, *Practice Commentaries*, C45–21, 28 U.S.C.A. Rule 45, at 389 (1992) (explaining that post-compliance applications for costs are appropriate).

Additionally, the requesting party's imminent need for discovery has been viewed as an appropriate basis for seeking the costs of compliance after completion of production. *See, e.g., In re Letters Rogatory*, 144 F.R.D. at 279 n. 5 ("The Court is also persuaded that in light of the pending November 13, 1992, deadline for discovery production in Argentina, that the Letters Rogatory are better served by beginning production immediately rather than being subject to further delay by time spent calculating the potential cost of production."). To meet the August 11, 1998, discovery cut-off, PW–UK proceeded with the necessary UK and Cayman applications without having obtained an order on costs. After those applications had concluded successfully, PW–UK informed this Court that its then-pending request for an order allocating costs could be better dealt with on the instant motion. PW–UK explained that it would be in a better position to make an appropriate assessment of the fees incurred in connection with the applications at that time.

FAC counters that PW–UK's failure to raise the issue deprived the Court and FAC

of any ability to control PW–UK's expenditures. However, this contention does little to bolster FAC's position because if the costs are deemed unreasonable, full reimbursement may be denied. Furthermore, the notice provided by PW–UK regarding the nature of the costs sufficiently defeats the assertion of waiver.

### B. *PW–UK Shall Receive Reimbursement From FAC in the Amount of $75,000*

It is undisputed that under the Subpoena PW–UK was compelled to produce documents that were subject to a variety of confidentiality obligations owed by PW–UK to the customers of BCCI, thus necessitating that expedited applications be made to the UK and Cayman courts to lift those impediments. The parties, as well as this Court and the Second Circuit, were aware that PW–UK could not have complied with the Subpoena without first making the appropriate applications.

The question presented, however—one of first impression—involves the determination of whether the expenses incurred in lifting the legal impediments that prevented compliance with the Subpoena are reimbursable under Rule 45(c)(2)(B). The answer is yes.

The Rule provides that "an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded." Fed.R.Civ.P. 45(c)(2)(B). This version of Rule 45 has made it easier for a nonparty to recover discovery costs than prior to its amendments in 1991. Under the old Rule 45, "[t]ypically a nonparty [was] required to absorb the costs of complying with a subpoena duces tecum." *Cantaline v. Raymark Indus., Inc.*, 103 F.R.D. 447, 450 (S.D.Fla.1984). Yet the previous version "gave district courts discretion to condition the enforcement of subpoenas on the [serving party's] paying for the [nonparty's] costs of production." *In re Exxon Valdez*, 142 F.R.D. 380, 383 (D.D.C.1992). This discretion has now become mandatory.

The language of the Rule, and its relationship to monetary costs, is somewhat peculiar. It is not necessarily clear that "protect" means that the requesting party foot the nonparty's bill of compliance. However, the Advisory Committee's note to the Rule, commentaries, and the small universe of decisions applying the Rule appear to intimate such an interpretation. *See, e.g.*, Fed. R.Civ.P. 45(c)(2)(B) advisory committee's note (discussing the Rule in terms of awarding costs); Siegel, *supra*, at 389 (same); *In re Exxon Valdez*, 142 F.R.D. at 383–85 (ordering party to reimburse nonparty for a portion of the reasonable costs of compliance, including the costs of producing, inspecting, and photocopying the requested documents).

PW–UK proposes that it is entitled to the $210,990.67 it spent on solicitors' and legal fees, as well as on disbursements, so as to lift the impediments existing under UK and Cayman law because such costs "resulted" from the "inspection and copying commanded." Indeed, these activities could not have commenced unless and until PW–UK made the UK and Cayman court applications. Had it not taken measures to obtain the releases, PW–UK would have been in contempt of this Court.

According to FAC, Rule 45's expense provision does not encompass the reimbursement of legal fees because pursuant to the "American Rule," litigants are not entitled to recover attorneys' fees from each other absent a contrary statutory directive. *See Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 255–57, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) (holding that Congress, and not the courts, have power to authorize exceptions to the "American rule" which states that attorney fees are not recoverable by a prevailing litigant in a federal litigation absent statutory authority); *see also Key Tronic Corp. v. United States*, 511 U.S. 809, 814–15, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994) (stating that "American rule" holds that "attorneys' fees are generally not a recoverable cost of litigation 'absent explicit congressional authorization'" (quoting *Runyon v. McCrarry*, 427 U.S. 160, 185–86, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976))). Yet PW–UK is not a party litigant but a nonpar-

ty witness being compelled to respond to a subpoena. The "American Rule" is therefore inapplicable.

A nonparty's legal fees, especially where the work benefits the requesting party, have been considered a cost of compliance reimbursable under Rule 45(c)(2)(B). *See Kahn v. General Motors Corp.*, No. 88 Civ. 2982, 1992 WL 208286, at *2 (S.D.N.Y. Aug. 14, 1992) (awarding a nonparty reimbursement of legal fees incurred "in connection with the retrieval, identification, and review of documents called for by the subpoena"); *cf. United States v. CBS, Inc.*, 103 F.R.D. 365, 374–75 (C.D.Cal.1984) (declining to award nonparty's outside counsel fees incurred in connection with complying with a subpoena, in part, because the fees solely benefitted the producing party). Here, the lifting of the legal impediments benefitted FAC, allowing it access to documents relevant to the DC Action.

FAC also proclaims that because the costs sought by PW–UK did not directly relate to the "inspection and copying commanded," they are unrecoverable. First, FAC's "plain language" interpretation of the Rule ignores the Rule's statement that recoverable costs include any expenses *"resulting* from the inspection and copying commanded." Fed. R.Civ.P. 45(c)(2)(B) (emphasis added). Second, the authority relied upon by FAC is unpersuasive. For instance, FAC cites to *Angell v. Shawmut Bank,* 153 F.R.D. 585, 590–91 (M.D.N.C.1994), for the proposition that fees for legal research and time expended to prepare a legal motion are "not recoverable" and that a nonparty is only entitled to reimbursement for time spent "collecting and selecting documents for copying."

In *Angell,* the nonparty did not move to quash or modify the subpoenas. *See id.* at 590. The requesting party contended that for this reason the nonparty had waived its right to reimbursement. The parties, however, had their own agreement concerning costs—one in which the requesting party had promised to reimburse the nonparty for "the reasonable costs of copying documents." *Id.* In construing the private agreement, the court found it significant that attorney fee rates or a provision regarding attorneys' fees

were not included. It therefore held that the nonparty could not recover attorneys' fees or production costs at attorney fee rates. Under the circumstances of the case, Rule 45(c)(2)(B) was not triggered. It was the private agreement that was interpreted to determine what costs were recoverable.

A narrow reading of Rule 45(c)(2)(B), as suggested by FAC, that distinguishes between the costs of production as opposed to costs of "inspection and copying" such that only the latter are protected runs afoul the spirit and purpose of the Rule. *See In re Exxon Valdez,* 142 F.R.D. at 383 n. 3. As stated in the Advisory Committee's note to the 1991 amendment, "a non-party required to produce documents or materials is protected against significant expense resulting from involuntary assistance to the court." Fed. R.Civ.P. 45(c)(2)(B) advisory committee's note; *see* Siegel, *supra,* at 389 ("If the court does grant the motion, and makes an order to compel, and the person against whom it is made is not a party, the court is required to ("shall") include in the order a provision for defraying the expenses that the production, inspection, copying, etc., may require.").

■ Having concluded that the costs sought by PW–UK are recoverable under the Rule does not end the inquiry. " 'Protection from significant expense does not mean that the requesting party necessarily must bear the entire cost of compliance.' " *Linder v. Calero–Portocarrero,* 180 F.R.D. 168, 177 (D.D.C.1998) (quoting *In re Exxon Valdez,* 142 F.R.D. at 383). The *Exxon* court explained that "there is no indication that [the drafters of new Rule 45] also intended to overrule prior Rule 45 case law, under which a nonparty can be required to bear some or all of its expenses where the equities of a particular case demand it." *In re Exxon Valdez,* 142 F.R.D. at 383. The relevant factors employed to determine how much of the production expense the requesting party should bear include "whether the nonparty actually has an interest in the outcome of the case, whether the nonparty can more readily bear the costs than the requesting party, and whether the litigation is of public importance." *Linder,* 180 F.R.D. at 177 (citing *In re Exxon Valdez,* 142 F.R.D. at 383).

242

PW–UK was not the quintessential innocent, disinterested bystander in the DC Action or in the proceedings before this Court. According to FAC, because of the role PW–UK played in the collapse of BCCI, it should have reasonably anticipated being drawn into subsequent litigation resulting from the BCCI fraud, such as the DC Action. Where a nonparty was "substantially involved in the underlying transaction and could have anticipated that [the failed transaction would] reasonably spawn some litigation," *Tutor–Saliba,* 32 Fed.Cl. at 610 n. 5, expenses should not be awarded. As the Second Circuit noted in this case,

> PW–UK's position as auditor gave it unique access to documents that may be critical in unraveling a bank fraud of unprecedented scale and, perhaps, a correspondingly unique responsibility .... [W]e think PW–UK could be expected to feel a professional commitment to clearing up the financial frauds that were committed by PW–UK's client and that presumably escaped PW–UK's scrutiny.

*First American III,* 154 F.3d at 20.

Additionally, where the nonparties were "involved in litigation ... arising out of the same facts," courts have viewed such parties as "not neutral" for purposes of awarding costs. *See Jackson Jordan Inc. v. Kyle Railways,* No. 87–1059–C, 1988 WL 236172, at *2 (D.Kan. Mar. 23, 1988). PW–UK has been a party to litigation involving BCCI's collapse since 1991. It has been sued for fraud and negligence in England and elsewhere, and has recently settled certain BCCI-related actions for $95 million. *See, e.g.,* Robert Bruce, "Legal Victory," *The Times,* Sept. 24, 1998; "Price Waterhouse Auditors Pay $95 Million Dollars in BCCI Settlement," *Agence France Presse,* Sept. 22, 1998.

Such interest is sufficient to demand that PW–UK absorb a portion of the costs for which it seeks reimbursement from FAC.

The factor regarding whether PW–UK can bear the costs at issue more readily than FAC neither supports nor hinders a reduction of costs that are to be borne by FAC under Rule 45(c)(2)(B).

This Court, as well as the Second Circuit, have recognized the strong public interest involved in the DC Action. As stated in *First American I,* "[i]t is difficult to imagine a private commercial lawsuit which could be more infused with public interest." 988 F.Supp. at 364; *see First American III,* 154 F.3d at 22 (finding that the DC Action is a suit "infused with the public interest"). The public importance of this case warrants a conclusion that PW–UK bear a portion of the costs. *Cf. United States v. International Business Machines (IBM),* 71 F.R.D. 88, 92 (S.D.N.Y.1976) (ruling in an antitrust action brought on behalf of the People that the nonparty had a duty to absorb the cots of complying with the subpoena because the case raised significant public issues and its outcome offered the nonparty certain competitive benefits).

Finally, FAC urges that because PW–UK tried to use the UK proceeding, not in good faith to seek the confidentiality releases, but in an indirect attempt to persuade the UK court to deny PW–UK permission to release documents, it should not be permitted to shift its costs to FAC. PW–UK denies the accusation, stressing that the applications to both the UK and Cayman courts were successful—in essence, "no harm done." FAC responds that due to the obstructive tactics utilized by PW–UK and its misrepresentations to the UK court regarding the scope of the Subpoena, it intervened in the UK proceedings to ensure that the case was handled effectively. FAC is determined that absent its intervention PW–UK's tactics may have worked.

As an example of PW–UK's effort to undermine the Subpoena, FAC points to PW–UK's inquiry on July 28, 1998 (approximately two weeks before the close of discovery in the DC Action) as to whether it was required to produce documents related to BCCI's loans to Clifford and Altman. FAC confirmed that such documents were covered by the Subpoena and provided specific documentation addressing its concerns at PW–UK's request. Despite receiving FAC's assurances and documentation on this point, PW–UK nonetheless petitioned the UK court for clarification. The UK court determined that

PW–UK's application was "unnecessary" because the documents in question were undoubtedly covered by the Subpoena:

> MR. JUSTICE RATTEE: Mr. Nicholls, really! Your client is just seeing imaginary problems. The only person who could complain about them breaching confidence by disclosing these documents would have been Messrs. Clifford and Altman, is that not right?
>
> MR. NICHOLLS: Yes.

Transcript of Proceedings, *In re Ghaith Pharaon/In re BCCI*, Nos. 123999 & 3770, at 21 (Ch. Div. July 31, 1998). FAC concludes that there is no equitable reason why it should be compelled to subsidize PW–UK's obstruction with funds that would otherwise go to BCCI's victims.

The equities presented in this case, specifically the role played by PW–UK and the public importance of the D.C. Action, warrant a reduction in the amount of reimbursement requested by PW–UK. The amount PW–UK requests, $210,990.67, is therefore reduced to $75,000. In light of the public significance of the DC Action, the role PW–UK played in it and related litigations, FAC's payment of $75,000 of the costs requested will sufficiently protect PW–UK from "significant expense" under Rule 45(c)(2)(B).

## II. *FAC's Motion for Determination of Reasonable Redaction Costs Is Denied for Lack of Jurisdiction*

■ FAC seeks intervention on a $654,700 bill submitted by PW–UK for the redaction of documents pursuant to a foreign court order. FAC submits that the bill is excessive and a $65,000 reimbursement is reasonable. PW–UK counters that because this dispute arises out of an undertaking given by FAC to the Cayman court and is embodied in that court's July 26, 1998 order permitting disclosure of information otherwise subject to Cayman confidentiality restrictions, only that court can properly determine if the undertaking has been satisfied and its order complied with. The question of what costs are "reasonable" in carrying out the review and redaction exercise must be construed by the court which assigned PW–UK that task and

required FAC to pay for it. Thus jurisdiction is lacking.

According to PW–UK, this Court also lacks jurisdiction over this dispute by reason of the limited jurisdictional scope of a Rule 45 subpoena enforcement proceeding. Such a proceeding does not provide an open forum for this Court to hear any and all disputes that the subpoena litigants may have.

In stating that this Court has inherent power to adjudicate matters relating to subpoenas issued under its authority, FAC cites to *In re Sealed Case,* 141 F.3d 337, 341–42 (D.C.Cir.1998), where the court mentioned that "only the issuing court has the power to act on its subpoenas." However, in that case, the court held that the court that had issued a subpoena may not transfer the motion to quash to the court with jurisdiction over the underlying dispute. Unlike the instant case, a party was not requesting the subpoena-issuing court to resolve a dispute stemming directly from a foreign court order.

At this juncture—keeping in mind that the subpoenaed documents have been produced and the underlying litigation in the District of Action has largely been settled—any remaining jurisdiction of this Court is that reserved in the Stipulation entered into by the parties. As stated in the Stipulation, "[t]his Court shall retain jurisdiction to hear any disputes or other matters arising out of or in relation to the Protective Order." *First American Corp. v. Price Waterhouse LLP,* No. M8–85, at ¶ 5 (S.D.N.Y. Nov. 2, 1998) (stipulation and order) [hereinafter, *First American Stipulation* ]. The Protective Order executed in August 1998 in connection with PW–UK's document production is a "plain vanilla" protective order which FAC obtained to satisfy its undertaking to the UK and Cayman courts to protect confidential information. Those undertakings are separate from the Costs Undertaking at issue here. As the Stipulation expressly recites, the Protective Order "prohibit[s][FAC] from using or disclosing confidential information contained within any document disclosed by [PW–UK] pursuant to the Subpoena for any purpose other than those of the [DC Action]." *Id.* at 3–4.

Granted, a broad reading of the Stipulation may confer jurisdiction over the redaction costs in that such costs may be deemed to be "in relation" to the Protective Order. Yet such a reading would stretch the authority of this Court beyond its scope. Because this Court became embroiled in the dispute between these parties on a limited basis, a narrow construction of the Stipulation is warranted. Thus the reasonableness of the redaction costs does not arise out of or is related to the Protective Order, which protects against misuse by FAC of the documents produced pursuant to the Subpoena. Rather it directly arises out of the Cayman Order. This Court refuses to step on the toes of the foreign court that issued the order requiring payment by FAC of PW–UK's reasonable redaction costs.

According to FAC, if jurisdiction exists to decide PW–UK's right to costs incurred pursuant to the Subpoena in the UK and Cayman Islands for lifting the legal impediments, *a fortiori*, it exists to decide PW–UK's claim for redaction costs. However, the Costs Undertaking dispute does not revolve around an agreement to reimburse PW–UK for the costs of complying with the Subpoena, or a Rule 45(c)(2)(B) request for those costs, but rather around a dispute arising from FAC's undertaking to pay the costs PW–UK incurred in complying with the UK and Cayman Orders. PW–UK would not have been able to comply with the Subpoena initially had it not lifted the legal impediments under UK and Cayman law. The resulting costs are those for directly complying with the Subpoena. It is worthy of note that in the Stipulation, jurisdiction was retained over PW–UK's motion for costs pursuant to Rule 45(c)(2)(B), decided above. The redaction costs, on the other hand, are costs of directly complying with a foreign order, reimbursement of which was specifically undertaken by FAC in the Cayman Order.

FAC additionally insists that jurisdiction should be exercised because this is the only Court before which FAC has agreed to pay the reasonable costs of redaction incurred in complying with both the Cayman and UK Orders and that FAC made no undertaking to the Cayman court with respect to the redaction required by the UK Order. FAC points to paragraph three of the Cayman Order, quoted in the Stipulation, that describes FAC's undertaking to include the payment of " 'costs and expenses reasonably and properly incurred in complying with the terms of this order.' " *First American Stipulation*, slip op. at 3.

PW–UK submits that the Cayman court's power to determine the Costs Undertaking dispute flows, not from the Cayman Confidentiality Law, but from the undertaking FAC gave to it and that FAC's contention that the Costs Undertaking was not intended to cover the entire costs of the review and redaction exercise is erroneous. After all, continues PW–UK, the sole evidence before the Cayman court when it made its disclosure order was that, as a practical matter, the exercise of reviewing and redacting information would be one exercise involving both UK and Cayman confidentiality restrictions and that FAC gave its undertaking knowing this.

Moreover, the Stipulation itself belies FAC's contention. Included in the Stipulation is the following: "in connection with the Cayman Order, First American also gave an undertaking to the Cayman Islands court to 'pay [PW–UK's] costs and expenses reasonably and properly incurred in complying with the terms of this order' (the 'Costs Undertaking')," *id.* at 3, and "by its *Costs Undertaking*, First American has agreed to pay a sum to be determined in respect of PW–UK's reasonable costs and expenses incurred in complying with the *U.K. and Cayman Orders*." *Id.* at 4 (emphasis added). This recital intimates that the Cayman court can give complete relief.

The Cayman Order—and not an order of this Court—imposed on FAC the responsibility of bearing the redaction costs incurred by PW–UK, and this Court did not retain jurisdiction over this issue in the Stipulation. Accordingly, FAC's motion is denied.

### Conclusion

PW–UK's motion for reimbursement of $210,990.67 in connection with its applications to the Cayman and UK courts is granted in part and denied in part. Specifically, FAC is

hereby ordered to reimburse PW–UK in the amount of $75,000.

FAC's motion for the determination of reasonable costs of redaction is denied for lack of jurisdiction.

Settle order on notice.

It is so ordered.